[JUDGMENT LIEN. LOCAL LAW.]

RANKIN & SCHATZELL, Plaintiffs in Error, *against* SCOTT,
Defendant in Error.

The lien of a judgment on the lands of the debtor, created by sta-
tute, and limited to a certain period of time, is unaffected by the
circumstance of the plaintiff not proceeding upon it, (during that
period,) until a subsequent lien has been obtained and carried into
execution.

Universal principle that a prior lien is entitled to prior satisfaction
out of the thing it binds, unless the lien be intrinsically defective,
or is displaced by some act of the party holding it, which shall
postpone him at law or in equity.

Mere delay in proceeding to execution is not such an act.

Distinction created by statute, as to executions against personal chat-
tels, and reasons on which it is founded.

ERROR to the District Court of Missouri.

This was an action of ejectment, brought in the Court
below by the defendant in error, Scott, to recover the pos-
session of a house and lot in the town of St. Louis. At
the trial, a special verdict was found, stating, that in the year
1816, John Little married Marie Antoinette Labadie, who
was then seised in fee of the house and lot in question. She
died without issue, leaving the husband seised in fee of a
moiety of the premises. He soon afterwards died without
issue, and intestate. In April, 1821, judgment was rendered
in the Circuit Court of the county where the premises lay,
against the administrator of Little, in favour of Schatzell
and another, for 2,747 dollars and 19 cents. In March fol-
lowing, another judgment was rendered against the same, in
favour of B. Pratte, for 1,241 dollars. Execution was im-
mediately issued upon the latter judgment, and the premises
in question sold under it to Scott, the plaintiff in ejectment;
and soon afterwards, another execution issued upon the
first judgment, and the same premises were sold to Schatzell,
one of the defendants below, and conveyed to him by the
sheriff's deed. Rankin, who was tenant to Little in his life-
time, remained in possession of the premises after his death.

1827.

Rankin
&
Schatzell
v.
Scott.

and attorned to Schatzell. The question raised upon these facts was, whether the sale by the Sheriff, under the second judgment and first execution, devested the lien of the first judgment? The Court below determined it in the affirmative; and the cause was brought, by writ of error, before this Court.

*Jan. 15th.*

Mr. *Benton*, for the plaintiffs in error, relied upon the express provisions of the statute of Missouri, to show that the local law made the first judgment a lien upon the land for the term of five years, within which time it was enforced, and Shatzell purchased under it.[a] For the general effect of a judgment lien, he cited the authorities in the margin.[b]

Mr. *Talbot*, contra.[c]

*Jan. 23d,*

Mr. Chief Justice MARSHALL delivered the opinion of the Court, and after stating the case, proceeded as follows :

The act of the then territorial government of Missouri, on which this question depends, is in these words : " Judgments obtained in the General Court shall be a lien on the lands and tenements of the person or persons against whom the same has been entered, situate in any part of this territory ; and judgments obtained in a Court of Common Pleas of any district, shall be a lien on the lands and tenements of the person against whom the same has been entered, situate in such district." The act contains a proviso, " that no judgment hereafter entered in any Court of record within this territory, shall continue a lien on the lands and tenements against whom the same has been entered, during a longer term than five years from the first return day of the term of which such judgment may be entered, unless the same shall have been revived by *scire facias*," &c.

*a Geyer's Dig. LL. Missouri*, 264. 267.
*b* 1 *Johns. Cas.* 224. 13 *Johns. Rep.* 463. 533. 1 *Dall.* 481. 486. 4 *Dall.* 450.
*c* 1 *Term Rep.* 729. 1 *Lord Raym.* 251. 1 *Burr.* 20. 3 *Co Rep.* 171. *Cro. Eliz.* 181. 1 *Salk.* 320.

Since the territory of Missouri was erected into a State, the General Court has received the appellation of the Superior Court, and the Court of Common Pleas for the district has been denominated the Circuit Court for the county. The execution on the first judgment was issued within a short time after it was rendered, and while the lien it created was in full force, unless it was removed by the execution and sale under the second judgment.

There is no expression in the law of Missouri which can suggest a doubt on this subject. By that law, judgments are to be a lien on all the lands of the debtor. This lien commences with the judgment, and continues for five years. The principle is believed to be universal, that a prior lien gives a prior claim, which is entitled to prior satisfaction, out of the subject it binds, unless the lien be intrinsically defective, or be displaced by some act of the party holding it, which shall postpone him in a Court of law or equity to a subsequent claimant. The single circumstance of not proceeding on it until a subsequent lien has been obtained and carried into execution, has never been considered as such an act. Take the common case of mortgages. It has never been supposed that a subsequent mortgage could, by obtaining and executing a decree for the sale of the mortgaged property, obtain precedence over a prior mortgage in which all the requisites of the law had been observed. If such a decree should be made without preserving the rights of the prior mortgagee, the property would remain subject to those rights in the hands of the purchaser. So, in cases of judgment, where an *elegit* may be sued out against the lands of the debtor. The implied lien created by the first judgment, retains the preference over the lien created by a second judgment, so long as an *elegit* can issue on the first. A statutory lien is as binding as a mortgage, and has the same capacity to hold the land so long as the statute preserves it in force.

The cases cited of executions against personal property, do not, we think, apply. In those cases, the lien is not created by the judgment, or by any matter of record. The purchaser of the goods cannot suppose that the officer has committed any impropriety in the performance of his duty.

1827.

U. States
v.
Tillotson.

and this circumstance has induced Parliament to secure him. It is stated by Ashhurst, Justice, in 1 *Term Rep.* 731. that this was the sole object of that part of the statute of frauds which relates to this subject. In the case at bar, the judgment is notice to the purchaser of the prior lien, and there is no act of the legislature to protect the purchaser from that lien.

We think, then, that the deed made by the Sheriff to the purchaser, under the first judgment, conveyed the legal title to the premises ; and that the judgment on the special verdict ought to have been in favour of the plaintiff.

Judgment reversed.

[PRACTICE.]

THE UNITED STATES *against* TILLOTSON and another.

Where the burthen of proof of certain specific defences set up by the defendant is on him, and the evidence presents contested facts, an absolute direction from the Court, that the matters produced and read in evidence on the part of the defendant were sufficient in law to maintain the issue on his part, and that the jury ought to render their verdict in favour of the defendant, is erroneous ; and a judgment rendered upon a verdict purporting to have been given under such a charge will be reversed, although the record was made up as upon a bill of exceptions taken at a trial before the jury upon the matters in issue, no such trial ever having taken place, and the case having assumed that shape by the agreement of the parties, in order to take the opinion of the Court upon certain questions of law.

*Feb. 24th.*

THIS cause was argued by the *Attorney General* and Mr. *Coxe* for the plaintiffs, and by Mr. *Webster* and Mr. *Wheaton* for the defendants.

*March 2d.*

Mr. Justice STORY delivered the opinion of the Court. This cause comes before us from the Circuit Court for the Southern District of New-York, as upon a bill of exceptions

taken to the opinion of the Court, upon a trial before a jury upon the matters in issue. In reality no such trial was had; but the case assumed this shape by the agreement of the parties, in order to have the opinion of the Court upon certain questions of law. We must, however, consider the case exclusively upon principles applicable to it as a bill of exceptions taken at a real trial.[a]

1827.

U. States
v.
Tillotson.

Upon the argument in this Court, various important questions have been elaborately discussed by counsel, upon which we forbear to express any opinion, as our judgment of reversal proceeds upon a ground, which renders any decision on them unnecessary.

The bill of exceptions admits the due execution of the bond in controversy, and the breaches stated in the declaration are answered by special notices of defence set up as bars to the suit. The burthen of proof of these defences, in point of fact, rested on the defendants. The Court is supposed to have charged the jury, that the matters produced and read in evidence on the part of the defendants were sufficient in law to maintain the issue on their part, and that the jury ought to render their verdict in favour of the defendants. This charge can be maintained in point of law only upon the supposition, that the evidence presented no contested facts; for otherwise it would withdraw from the jury their proper functions, to determine the facts upon the evidence in the cause.

Upon examining the record, we think that there is contradictory evidence, or rather evidence conducing to opposite results, in respect to a point material to many of the specifications of defence, and particularly as to the matters in the third, fifth, sixth, seventh, eighth and ninth. It is this: whether the contract of the 7th of June, 1820, between Col. Gadsden, as agent of the War Department, and Samuel Hawkins, was ever a consummated agreement, binding on the United States, in virtue of an original authority given to him,

a The cause was argued and determined in the Court below upon a case agreed upon between the parties, containing a state of facts; but as the state of facts was not annexed to the transcript of the record, this Court could not take notice of it.

or was a preliminary agreement dependent for its validity upon the ratification of the War Department; and if that was withheld, (which there was direct evidence to prove,) the agreement was a mere nullity. The bill of exceptions does not in terms find, that the agreement was such a consummated agreement. It merely states, that "on or about the 7th of June, 1820, Col. James Gadsden, then acting as the agent for fortifications at Mobile Point, and *thereto duly authorized by the said War Department*, did enter into an agreement or contract with the said Samuel Hawkins, touching the foregoing contract, with the said Benjamin W. Hopkins, and the erection of the fort therein provided for," &c. The word " thereto" may be applied either to the next antecedent, the agency of fortifications, or to the subsequent clause stating the agreement. It may mean, having a due authority as agent for fortifications, or having a due authority to enter into the agreement. The recital in the agreement itself, that Col. Gadsden entered into it " in pursuance of the instructions of the Secretary of the War Department," would not be decisive of the point, supposing it to be entitled to the fullest weight as matter of recital. But the case does not rest here : in another part of the record, evidence is introduced on the part of the United States, to establish, that the agreement so made had never been ratified on the part of the War Department; and also to show, that it was understood by that department, that without such ratification the contract was not obligatory. We allude to that part of the record, where it is stated, that the agreement, as soon as executed at Mobile Point, was transmitted to the War Department, and that a letter was written by the authority of that department, under date of the 10th July, 1820, to the defendants, as Hawkins's sureties, enclosing a copy of the agreement, and requesting them, if they would sanction it, to send certificates of the fact, and "signify their approval, and authorize it to be carried into effect"—and it is added, " should you object, *the contract will be carried on as before*," that is, the *original* contract. It is further found by the case, that the agreement "was not ratified by the Secretary of War, nor ever acted upon, except so far as it may appear to have

been ratified and acted upon by the said transcript" (of the treasury accounts) contained in the record.

It appears to us, that, taking this evidence together, it was not a conceded point, but a matter of controversy between the parties, whether the agreement was obligatory upon the United States, and had become absolute by the assent of all the persons who had authority to perfect the same. This being so, it was a matter of fact to be decided by the jury; and the charge of the Court was erroneous in withdrawing it from the consideration of the jury.

For this reason it is our opinion, that the judgment of the Circuit Court was erroneous, and ought to be reversed, and the cause be remanded, with directions to award a *venire facias de novo.*[a]

---

[BILL OF EXCHANGE AND PROMISSORY NOTE. SALE WITH WARRANTY.]

## THORNTON, Plaintiff in Error, *against* WYNN, Defendant in Error.

An unconditional promise, by the endorser of a bill or note, to pay it, or the acknowledgment of his liability, after knowledge of his discharge from his responsibility by the laches of the holder, amounted to an implied waiver of due notice of a demand from the drawee, acceptor, or maker.

Upon a sale with a warranty of soundness, or where, by the special terms of the contract, the vendee is at liberty to return the article sold, an offer to return it is equivalent to an offer accepted by the vendor, and the contract being thereby rescinded, it is a defence, to an action for the purchase money, brought by the vendor, and will entitle the vendee to recover it back if it has been paid.

So, if the sale is absolute, and the vendor afterwards consent unconditionally to take back the article, the consequences are the same.

But if the sale be absolute, and there be no subsequent consent to take back the article, the contract remains open, and the vendee must resort to his action upon the warranty, unless it be proved that the vendor knew of the unsoundness of the article, and the vendee tendered a return of it within a reasonable time.

a See 1 *Paine's Rep.* 305. S. C.

1827.

Thornton

v.

Wynn.

Jan. 31st.

This cause was argued by Mr. *C. C. Lee* for the plaintiff in error,[a] and by Mr. *Worthington* for the defendant in error.[b]

Mr. Justice WASHINGTON delivered the opinion of the Court.

This was an action brought by the defendant in error against the plaintiff in error, in the Circuit Court for the District of Columbia and county of Washington, upon a promissory note given by one Miller to Thornton, and by him endorsed to Wynn. The declaration contains a count upon the note, and also the common counts for money laid out and expended, and for money had and received.

At the trial of the cause upon the general issue, the defendant below took two exceptions to the opinion of the Court, which are to the following effect. The first states, that the plaintiff gave in evidence the note and endorsement mentioned in the declaration, and in order to dispense with the proof of the ordinary steps of diligence in presenting and demanding the note of the drawer, and giving notice to the endorser, the plaintiff offered evidence to prove, hat, a few weeks before the institution of this suit, the note in question was presented to the defendant, who, being informed that Miller, the drawer, had not paid the note, said, " he knew Miller had not, and that Miller was not to pay it ; that it was the concern of the defendant alone, and Miller had nothing to do with it ; that the note had been given for part of the purchase money of a certain race horse called Ratler, and that the defendant offered to take up the said note if the plaintiff's agent would give time, and receive other notes mentioned in payment :" to the admission and competency of which evidence the defendant objected ; but the Court overruled the objection, and

*a* 2 *H. Bl.* 609. 1 *Moore's Rep. C. P.* 535. 3 *Camp.* 57. 11 *East's Rep.* 114. 4 *Dall.* 109. 4 *Taunt.* 93. 1 *Esp.* 261. 6 *East's Rep.* 110. 1 *H Bl.* 17.

*b* 1 *Term Rep.* 405. 2 *Term Rep.* 703. 1 *Esp.* 302. 12 *East's Rep.* 171. 4 *Cranch,* 141. 2 *Johns. Rep.* 1. 7 *Mass. Rep.* 449. 5 *Mass. Rep.* 170. 11 *Johns. Rep.* 180. *Peake's N. P. Cas.* 203. 1 *Taunt.* 12. 2 *Term Rep.* 713. 15 *East's Rep.* 275. *Cowp.* 838. *Dougl.* 24. 1 *Term Rep.* 133. 7 *East's Rep.* 274. 2 *Taunt.* 2. 14 *Johns. Rep.* 416. 2 *East's Rep.* 320.

admitted the evidence as competent to support this action, without any further proof of demand upon the drawer or notice to the endorser.

That the said evidence being so admitted by the Court, the defendant offered evidence to prove that the said note was given for part of the purchase money of the said race horse, then celebrated for his performances on the turf, sold by the plaintiff to the defendant, and the said Miller, the drawer of the note, for 3,000 dollars, of which 2,000 dollars had been paid; that the plaintiff, at the time of so selling this horse, warranted him sound, and declared him capable of beating any horse in the United States, and recommended the purchasers to match him against a celebrated race horse in New-York called Eclipse; that he also gave a representation of his pedigree, which he described as unexceptionable, and promised to procure his pedigree and send it to the defendant. And the defendant then offered evidence to prove that the said horse, at the time of the said sale, was utterly unsound, and broken down, and had been broken down whilst in the plaintiff's possession, and was reputed and proven by persons in the neighbourhood of the plaintiff, who afterwards communicated the same to the purchaser; and was wholly unfit for, and incapable of, the action and fatigue necessary to a race horse; and that the plaintiff had wholly failed to procure and furnish the pedigree of the horse as he had agreed, and that a pedigree was an essential term in the purchase of the horse, or ordinarily is so in the purchase of such horses, without which this horse was worth nothing; and that the said Miller, as soon as it had been ascertained by repeated trials that the horse was incurably unsound, offered to return him to the plaintiff, who refused to take him back, although the former offered to lose what he had already paid for the horse, which offer was made after the note fell due. Whereupon the Court instructed the jury, at the prayer of the plaintiff, that if they should be of opinion, from the said evidence, that the said horse was, at the time of the said sale, utterly unsound and broken down, and had been broken down whilst in the plaintiff's possession, and was wholly unfit for, and incapable of, the action and fatigue ne-

1827.

Thornton
v.
Wynn.

cessary to a race horse, but that the said facts were not known to the plaintiff at the time of the said sale, the said facts are not a sufficient defence in this action to prevent the plaintiff from recovering.

Upon these instructions of the Court, the jury found a verdict for the plaintiff, and the cause now comes before this Court upon a writ of error.

Questions presented by the bill of exceptions.

This bill of exceptions presents two questions for the decision of this Court. The first is, whether the evidence offered by the plaintiff, and admitted by the Court. dispensed with the necessity of proving a demand of payment of the maker of the note, and due notice to Thornton of nonpayment; and, secondly, whether the Court below erred or not, in stating to the jury that the alleged breach of the warranty of the horse, if proved to their satisfaction, was not a sufficient defence in this action to prevent the plaintiff from recovering, unless the facts stated in the bill of exceptions were known to the plaintiff at the time of the sale.

In the argument of the first question, the counsel on both sides considered the evidence offered by the plaintiff as presenting a double aspect. 1st. As authorizing a conclusion, in point of fact, that the note of hand on which the suit is brought, was made and passed to Thornton without consideration, and merely for his accommodation; and, 2d. As amounting to a promise to pay the note, or at least to an admission by Thornton of his liability to pay it, and of the right of the plaintiff to resort to him, whether it was made solely for his accommodation, or was given for value in the ordinary course of trade.

As to the first, the counsel treated the note throughout as an accommodation note, and submitted to the decision of this Court the question, whether the endorser of such a note was entitled to call for proof of a demand of payment of the maker, and notice to himself?

Whether this question was ever raised in the Court below, or in what manner it was there treated, does not appear from the bill of exceptions. It is possible that that Court may have intended nothing more by their direction to the jury, than to sanction the admissibility of the evidence, and its sufficiency to authorize a verdict for the plaintiff.

1827.

Thornton
v.
Wynn.

without other proof of demand and notice, provided the jury should be of opinion that it warranted the conclusion that the note was given without consideration. But such is not the language of the Court as stated in the bill of exceptions. The jury were informed that the evidence was competent to support the action without such further proof of demand and notice, without leaving the inference of fact that the note was given without consideration to be drawn by the jury. Had the Court distinctly stated to the jury that this was such a note, and, therefore, that further proof of demand and notice was unnecessary, the incorrectness of the direction could have been doubted by no person, since the Court would, in that case, have inferred a fact from the evidence, which it was competent to the jury alone to do. And yet it seems difficult to distinguish the supposed case from the one really presented by the bill of exceptions, upon the hypothesis that the Court below decided any thing as to the particular character of this note, since it is very obvious, that no question of fact was submitted to the consideration of the jury. It is, therefore, due from this Court to the one whose decision we are revising, to conclude, that that decision did not proceed upon the assumption that this was a note drawn for the accommodation of the endorser.

It remains to be considered, whether the direction was correct upon the other aspect of the evidence.

It is now well settled as a principle of the law merchant, that an unconditional promise by the drawer or endorser of a bill, to pay it, after full knowledge of all the circumstances necessary to apprize him of his discharge from his responsibility by the laches of the holder, amounts to an implied waiver of due notice of a demand of the drawer or acceptor, and dispenses with the necessity of proving it. Such are the cases of *Borrodaile* v. *Lowe*, (4 *Taunt*. 93.) *Donaldson* v. *Mears*, (4 *Dall*. 109.) and others which need not be cited. So if, with the knowledge of these circumstances, he answer, that the bill "must be paid," "that when he comes to town he would set the matter right," "that his affairs were then deranged, but that he would be glad to pay it as soon as his accounts with his agents was settled," or "that he would see it paid," or if he pay a part of the bill; in all

An unconditional promise to pay a- mounts to a waiver of no- tice.

So an ac- knowledgment of the drawer's or endorser's liability has the same ef- fect.

these cases it has been decided that proof of regular notice is dispensed with. (2 *Term Rep.* 713. *Bull. N. P.* 276. 2 *Campb.* 188. 6 *East*, 16. 2 *Stra.* 1246.)

The principle upon which these decisions proceed is explained in many of the above cases, and particularly in that of *Rogers* v. *Stephens*, (2 *Term Rep.* 713.) It is this, that these declarations and acts amount to an admission of the party that the holder has a right to resort to him on the bill, and that he had received no damage for want of notice. See also *Stark. Evid.* 272.

The same principle applies with equal force to promissory notes, which, after endorsement, partake of the character of bills of exchange, the endorser being likened to the drawer, and the maker to the acceptor of a bill. The case of *Leffingwell & Pearpoint* v. *White*, (*Johns. Cas.* 99.) is that of a promissory note, where the endorser, before it became due, stated that the maker had absconded, and that, being secured, he would give a new note, and requested time. The Court say, that the defendant had admitted his responsibility, treated the note as his own, and negotiated for further time for payment, by which conduct he had waived the necessity of demand of the maker, and notice to himself. (*Taylor* v. *Jones*, 2 *Campb.* 105. *Vaughan* v. *Fuller*, 2 *Stra.* 1246. and *Aman* v. *Bailey*, *Bull. N. P.* 276.) were all cases of actions on promissory notes against the endorser. In this case, the defendant below, upon being informed that Miller, the maker of the note, had not paid it, observed, that he knew he had not, and that he was not to pay it; that it was the concern of the defendant alone, and that Miller had nothing to do with it, it having been given for part of the purchase money of a horse. These declarations amounted to an unequivocal admission of the original liability of the defendant to pay the note, and nothing more. It does not necessarily admit the right of the holder to resort to him on the note, and that he had received no damage from the want of notice, unless the jury, to whom the conclusion of the fact from the evidence ought to have been submitted, were satisfied that the defendant was also apprized of the laches of the holder in not making a regular demand of payment of the note, by which he was dis-

*Knowledge of the fact of the laches of the holder is essential to charge the endorser, upon his promise or acknowledgment.*

charged from his responsibility to pay it. The knowledge of this fact formed an indispensable part of the plaintiff's case, since without it it cannot fairly be inferred that the defendant intended to admit the right of the plaintiff to resort to him, if, in point of fact, he had been guilty of such laches as would discharge him in point of law. For any thing that appeared to the Court below from the evidence stated in the bill of exceptions, the admissions of the defendant may have been made upon the presumption that the holder had done all that the law required of him in order to charge the endorser. That due notice was not given to the defendant he could not fail to know; but that a regular demand of the maker of the note could not be inferred *by the Court* from the admissions of the defendant.

For the reasons above stated, the judgment of the Court below must be reversed, and the cause remanded for a new trial.

But since the second question before mentioned has been distinctly brought to the notice of this Court, has been fully argued, and must again be decided by the Court below, it becomes necessary that this Court should pass an opinion upon it. That question is, whether the alleged breach of the warranty of the horse, the price of which formed part of the consideration of the note, if proved to the satisfaction of the jury, was a sufficient defence in this action to prevent the plaintiff from recovering, unless the facts stated in the bill of exceptions were known to the plaintiff below at the time of the sale?

The question is not whether the purchaser of a horse which is warranted sound, has a remedy over against the vendor, upon the warranty, in case it be broken, but whether, in an action against him for the purchase money, he can be permitted to defend himself by proving a breach of the warranty.

The cases upon this subject are principally those where the vendee, having executed the contract on his part, by paying the purchase money, brought an action of *indebitatus assumpsit* against the vendor as for money had and received to his use. But it is perfectly clear, that the reasoning of the Court in those cases applies with equal force to

1827.

Thornton
v.
Wynn.

Question as to the breach of the warranty in the sale, which formed part of the consideration of the note.

How far it constituted a defence to the action on the note.

a case where the. breach of the warranty is set up by the vendee as a defence against an action against him to recover the purchase money.

The first case we meet with on this subject, is that of *Power* v. *Wells*, of which a very imperfect report is to be seen in a short note in *Dougl.* 24. and in *Cowp. Rep.* 818. There the plaintiff gave a horse and 20 guineas to the defendant, for another horse, which he warranted to be sound, but which proved otherwise. The plaintiff offered to return the horse, which was refused, and the plaintiff brought two actions, one for money had and received, to recover back the 20 guineas which he had paid, and an action of trover for the horse, possession of which the plaintiff had delivered to the defendant. The Court decided, that neither action could be maintained ; not the second, because the property had been changed. This case was referred to by the Judge who had decided it at *Nisi Prius*, in the case of *Weston* v. *Downes*, (*Dougl.* 23.) which soon after came before the Court of King's Bench. That was an action for money had and received, and the case was, that the plaintiff had paid a certain sum to the defendant for a pair of horses, which the defendant agreed, at the time, to take back, if they were disapproved of, and returned within a month. They were returned accordingly within the stipulated period, and another pair was sent in their stead, without any new agreement. These were likewise returned, and accepted by the vendor, and a third pair were sent, which being likewise offered to be returned, the vendor refused to take them back. Lord Mansfield was against the action, because the contract, being a special one, the defendant ought to have notice by the declaration that he was sued upon it. Ashhurst, J., was of the same opinion ; but added, that if the plaintiff had demanded his money on the return of the first pair of horses, this action would have lain, but that the contract was continued ; from which expression nothing more is understood to have been meant, than that the contract remained open. The ground upon which Buller, J., thought that the action could not be maintained was, that, by refusing to take back the horses, the defendant had not precluded himself from entering into

the nature of the contract, and that, whenever that is open, it must be stated specially.

The meaning of these latter expressions is distinctly stated by the Court, and particularly by this judge, in the case of *Towers v. Barret*, (1 *Term Rep.* 133.) which followed next in order of time; that was also an action for money had and received. The money was paid for a horse and chaise, to be returned in case the plaintiff's wife should not approve of them. They were accordingly sent back to the defendant in three days after the sale, and left on his premises against his consent to receive them.

Lord Mansfield, Ch. J., and Willis, J., distinguish this case from that of *Weston v. Downes*, upon the ground that that was an absolute, and this a conditional agreement, which was at an end by the return of the horse and chaise, and was no longer open. Both the judges treat the case as if the vendor had taken back the property, although, in fact, he had not consented to do so. Ashhurst, J. was of opinion, that this case would have resembled that of *Weston v. Downes*, if, in that, the plaintiff had returned the horses. It is very clear, from what was said by the same judge in that case, that his meaning in this was, if the plaintiff had returned the *first pair of horses*, and then demanded his money; for, he adds, that in that case there was an end of the first contract by the plaintiff's taking other pairs, and this constituted a new contract, not made on the terms of the first. But in this case the contract was conditional, and when the horse and chaise were returned, the contract was at an end, and the defendant held the money against conscience. Buller, J., is still more explicit. He says, that the defendant, by *the contract*, had put it in the power of the plaintiff to terminate it, by returning the horse and chaise, and that the plaintiff had no option to refuse to take them back; and that, being bound to receive them, the case was the same as if he had actually accepted them. He adds, that the distinction between those cases where the contract is open, and where it is not, is, that if it be rescinded, *either by the original terms of the contract*, as in this case, where no act remains to be done by the defendant, or *by a subsequent assent* by him, the plaintiff may recover back his whole

money, and then this action will lie. But if it be open, the plaintiff's demand is only for damages arising out of the contract.

The Court proceeded upon this distinction in deciding the case of *Payne* v. *Whale,* (7 *East's Rep.* 274.) which followed the one just noticed. The action was to recover back money paid to the defendant for a horse sold by him to the plaintiff, which he warranted sound. The plaintiff offered to return the horse upon an allegation of his unsoundness, which the defendant denied, and refused to take him back, but agreed that, if he was in fact unsound, he would take him back, and return the purchase money. The unsoundness was proved at the trial; but the Court was of opinion, that the action could not be supported, and distinguished this case from the preceding one by observing, that in that the plaintiff had an option, by *the original contract*, to rescind it on a cert in event; but, here, it was no part of the original contract that the horse was to be taken back; and that the sub equent promise amounted to no more than that he would take him back if the warranty were shown to be broken, which still left the question of warranty open for discussion, and then the form of the action ought to give the defendant notice of it by being brought upon the warranty.

The case of *Lewis* v. *Congrave,* (2 *Taunt.* 2.) was precisely like the present, in which the same distinction, and the same principles, were recognised by the judge who tried the cause at *Nisi Prius.* It was an action on a bill drawn for the price of a horse, which, on the sale of him, was warranted sound, but turned out not to be so. The defendant offered to return the horse, which was refused, and the defendant left him in the plaintiff's stable without his knowledge. The judge decided, that as the plaintiff had refused to take back the horse, the contract of sale was not rescinded, and, consequently, that the defendant must pay the bill, and take his remedy by action for the deceit. But upon a rule to show cause why a new trial should not be granted, the Court said, that it was clear the plaintiff knew of the unsoundness of the horse, which was clearly a fraud, and that no man can recover the price of an article sold under a

fraud.   See also the cases of *Fortune* v. *Lingham,* (2 *Campb.* 416.) and *Solomon* v. *Turner,* (1 *Stark.* 51.)

The result of the above cases is this : if, upon a sale with a warranty, or if, by the special terms of the contract, the vendee is at liberty to return the article sold, an offer to return it is equivalent to an offer accepted by the vendor, and, in that case, the contract is rescinded and at an end, which is a sufficient defence to an action brought by the vendor for the purchase money, or to enable the vendee to maintain an action for money had and received in case the purchase money has been paid.   The consequences are the same where the sale is absolute, and the vendor afterwards consents, unconditionally, to take back the property ; because, in both, the contract is rescinded by the agreement of the parties, and the vendee is well entitled to retain the purchase money in the one case, or to recover it back in the other.   But if the sale be absolute, and there be no subsequent agreement or consent of the vendor to take back the article, the contract remains open, and the vendee is put to his action upon the warranty, unless it be proved that the vendor knew of the unsoundness of the article, and the vendee tendered a return of it within a reasonable time. We are, therefore, of opinion, that the direction of the Court in this case, upon the second exception, was entirely correct.   The judgment is to be reversed, and the cause remanded to the Court below for a new trial.

1827.

Mallow
v.
Hinde.

General result of the authorities.

---

[PRACTICE.]

## MALLOW and Others *against* HINDE.

Where an equity cause may be finally decided as between the parties litigant, without bringing others before the Court, who would, generally speaking, be necessary parties, such parties may be dispensed with in the Circuit Court, if its proofs cannot reach them, or if they are citizens of another state.

But if the rights of those not before the Court are inseparably connected with the claim of the parties litigant, so that a final decision cannot be made between them without affecting the rights of the absent parties, the peculiar constitution of the Circuit Court forms no ground for dispensing with such parties.

But the Court may, in its discretion, where the purposes of justice require it, retain jurisdiction of the cause on an injunction bill as between the parties regularly before it, until the plaintiffs have had an opportunity of litigating their controversy with the other parties in a competent tribunal, and if it finally appear by the judgment of such tribunal, that the plaintiffs are equitably entitled to the interest claimed by the other parties, may proceed to a final decree upon the merits.

*Feb. 12th.*        THIS cause was argued by Mr. *Bond* and Mr. *Brush*, for the appellants, and by Mr. *Doddridge* and Mr. *Scott*, for the respondents.

*Feb. 20th.*        Mr. Justice TRIMBLE delivered the opinion of the Court.

This is an appeal from the decree of the Circuit Court for the District of Ohio, dismissing generally, with costs, the bill of the appellants, who were plaintiffs in that Court.

The suit was a contest for land in the District, set apart on the north-west side of the Ohio, for the satisfaction of the bounty lands due to the officers and soldiers of the Virginia line, or continental establishment, in the revolutionary war.

The plaintiffs set up claim to the land by virtue and under a survey, No. 537, in the name of John Campbell. It appears that John Campbell, before his death, made his last will and testament, whereby he devised his land warrants, entries and surveys, in the military district, to Col. Richard Taylor and others, his executors, in trust for the children of the testator's sister, Sarah Beard; and that Taylor alone qualified as executor, and took upon himself the trust. Taylor never conveyed or assigned the warrants, entries, or surveys, to Mrs. Beard's children, but permitted them, as the bill charges, to take the management of them into their own hands.

Elias Langham made sundry executory contracts with Mrs. Beard's children, after they arrived at full age, which contracts are set out in the bill, whereby, as the complain-

ants allege, Langham became equitably entitled to survey No. 537; and afterwards sold, and made deeds of conveyance for the land to the complainants; who, in consequence of their purchases from Langham, took possession of, and improved the land.

Thomas S. Hinde, having purchased and procured an assignment of a military warrant from Col. Richard Taylor, and belonging to him in his own right, made an entry thereof in Hinde's own name in the principal surveyor's office; and having caused a survey to be made thereupon, covering survey No. 537, in the name of Campbell, Hinde obtained a patent for the land from the government.

Being thus clothed with the legal title, Hinde instituted actions of ejectment in the Circuit Court against the appellants, and obtained judgments of eviction against them.

They filed their bill praying for an injunction against the judgments at law; and also praying that Hinde should be decreed to release and convey to them his legal title, and for general relief.

The bill charges, that Col. Richard Taylor, with full notice that the appellants were, in virtue of Langham's contract with the cestuis que trust, and Langham's sale to them, equitably entitled to, and in possession of, survey No. 537, fraudulently combined with Hinde and others, and improperly and without authority, withdrew the entry on which survey No. 537 had been made, and re-entered and caused it to be surveyed elsewhere; and that Hinde, availing himself of such improper and unauthorized withdrawal, had entered, surveyed and patented the land in his own name, he also having notice of all the circumstances attending the claim of the appellants; and that Taylor and the Beards refuse to perfect the survey by obtaining a patent, and refuse to convey or transfer it to the appellants.

The bill also alleges, that Langham had become equitably and legally entitled to the survey No. 537, as a purchaser thereof for taxes due thereon to the state of Ohio.

Hinde filed his answer, in which he denies the charges of fraud and collusion; insists the land had become vacant by the withdrawing of the entry in the name of Campbell, and by surveying it elsewhere; and that he had legally ap-

propriated it by his entry, survey, and grant; he neither admits nor denies the execution of the contracts alleged between Langham and the Beards, and puts the complainants upon proof; and he further insists that such contracts, if made, conferred upon Langham no equitable title: first, because the Beards had no power to sell, without the concurrence of Taylor, the trustee; and, secondly, because Langham had obtained the contracts by fraud, and had not paid the consideration stipulated.

Neither Taylor, the trustee, nor the *cestuis que trust*, with whom the complainants allege Langham contracted for the land, are made defendants, they being out of the limits of the jurisdiction of the Court.

No attempt has been made in the argument to support the validity of the tax sale, and it may be laid out of the case.

For the appellees it is insisted, that the proper parties are not before the Court, so as to enable the Court to decree upon the merits of the conflicting claims. And we are all of that opinion. It is plain, that the appellants cannot set up the survey No. 537, against the appellees' title, without first showing themselves entitled to that survey. They claim that survey, not by any assignment, or other instrument, investing them with a legal right to it, but by executory agreements, the validity and obligation of which the parties to them have a right to contest.

We cannot try their validity, and decide upon their efficacy, by affirming they confer upon the appellants an equitable right, without manifest prejudice to the rights of those not before the Court. The complainants can derive no claim in equity to the survey, under, or through Langham's executory contracts with the Beards, unless these contracts be such as ought to be decreed against them specifically by a Court of equity. How can a Court of equity decide that these contracts ought to be specifically decreed, without hearing the parties to them? Such a proceeding would be contrary to all the rules which govern Courts of equity, and against the principles of natural justice. Taylor, too, is the legal proprietor of the warrant, by virtue of which the entry and survey No. 537 was made, and in general the right of removal is incidental to the right of property. But it is al-

leged he.has parted with that incidental right, although the general legal title of ownership remains in him ; or that he has exercised this incidental right fraudulently and improperly, to the prejudice of the appellants. .

Can any Court justly strip him of this incidental right, or convict him of fraud unheard ? Besides, if the Court should, by its decree, compel Hinde to release his legal title to the complainants, upon the grounds, that the entry and survey No. 537 are superior to his title, it would be giving to the complainants that which belongs to Taylor as trustee, and to his *cestuis que trust*, unless by their acts and agreements they have parted with their right to the survey. If the Courts of the United States were Courts of general jurisdiction, it could not be doubted, that Taylor, William and Joseph Beard, and Mr. M·Gowan and wife, would be necessary and indispensable parties, without whom no decree upon the merits could be made. But it is contended, that the rule which prevails in Courts of equity generally, that all the parties in interest shall be brought before the Court, that the matter in controversy may be. finally settled, ought not to be adopted by the Courts of the United States, because from the peculiar structure of their limited jurisdiction over persons, the application of the rule in its full extent would often oust the Court of its acknowledged jurisdiction over the persons and subject before it.

It is true, this equitable rule is framed by the Court of equity itself, and is subject to its sound discretion. It is not, like the description of parties, an inflexible rule, the failure to observe which turns the party out of Court, merely because it has no jurisdiction over his cause ; but being introduced for the purposes of justice, is susceptible of considerable modifications for the promotion of these purposes. Accordingly, this Court, in the case of *Elmendorf* v. *Taylor*, (10 *Wheat.* 167.) has.said, " That the rule which requires that all persons concerned in interest, however remotely, should be made parties to the suit, though applicable to most cases in the Courts of the United States, is not applicable to all. In the exercise of its discretion, the Court will require the plaintiff to do all in his power to bring every person concerned in interest before the Court. But if the case may

Mallow
v.
Hinde.

be *completely* decided, as between the litigant parties, the circumstance that an interest exists in some other person, whom the process of the Court cannot reach, as if such party be the resident of some other State, ought not to prevent a decree upon its merits."

This doctrine was applied to the case where a small interest was outstanding in one not before the Court, as tenant in common.

In that case, the right of the party before the Court did not depend upon the right of the party not before the Court; each of their rights stood upon its own independent basis; and the ground upon which it was necessary, according to the general principle, to have both before the Court, was to avoid multiplicity of suits, and to have the whole matter settled at once.

In this case, the complainants have no rights separable from, and independent of, the rights of persons not made parties. The rights of those not before the Court lie at the very foundation of the claim of right by the plaintiffs, and a final decision cannot be made between the parties litigant without directly affecting and prejudicing the rights of others not made parties.

We do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all Courts of equity, whatever may be their structure as to jurisdiction. We put it on the ground that no Court can adjudicate directly upon a person's right, without the party being either actually or constructively before the Court.

We have no doubt the Circuit Court had jurisdiction between the complainants and the defendant, Hinde, so far as to entertain the bill, and grant an injunction against the judgments at law, until the matter could be heard in equity.

And if it had been shown to the Circuit Court, that from the incapacity of that Court to bring all the necessary parties before it, that Court could not decide finally the rights in contest, the Court, in the exercise of a sound discretion, might have retained the cause, and the injunction, on the application of the complainants, until they had reasonable time to litigate the matters of controversy between them, and Taylor and the Beards, in the Courts of the State, or

such other Courts as had jurisdiction over them; and if then it was made to appear by the judgment of a competent tribunal, that the complainants were equitably interested with the rights of Taylor, the trustee, and the *cestuis que trust* in the survey No. 537, the Circuit Court could have proceeded to decree upon the merits of the conflicting surveys.

1827.

Connor
v.
Featherstone

Such a proceeding would seem to be justified by the urgent necessity of the case. in order to prevent a failure of justice ; and the cause would have remained under the control of the Circuit Court, so as to have enabled it to prevent unreasonable delay, by the negligence or design of the parties, in litigating their rights before some competent tribunal.

The cause having been brought to a hearing before the Circuit Court in its present imperfect state of preparation, that Court could not do otherwise than dismiss the bill; but as no final decision of the rights of parties could properly be made, the dismission, instead of being general, ought to have been without prejudice. So much of the decree as dismisses the bill generally must be reversed, and the decree, in all things else, affirmed ; and the cause is to be remanded to the Circuit Court, with directions to dismiss the bill without prejudice.

[FRAUDULENT AGREEMENT.]

CONNOR and Others, Appellants, *against* FEATHERSTONE and Others, Respondents.

A question of fact upon a bill filed to set aside the sale and assignment of a land warrant, upon the ground that it was obtained by fraudulent misrepresentation, and taking undue advantage of the party's imbecility of body and mind.

Evidence deemed insufficient, and bill dismissed.

THIS cause was argued by Mr *White*, for the appellants, and by Mr. *Isaacks*, for the respondents.

*Jan. 1*

Mr. Justice TRIMBLE delivered the opinion of the Court.

This case comes before the Court by appeal from the decree of the Circuit Court for the Western District of Tennessee.

The bill was instituted by James Hibbits in his lifetime, and after his death the suit was revived in the names of the appellees, his heirs at law, after which the defendants, now appellants, appeared and answered.

The object of the suit was, to have delivered up to the complainant a land warrant of 5,000 acres, which had been issued in the name of James Hibbits, upon an entry made by him in John Armstrong's office, No. 394., and to restrain James and Henry W. M. Connor, and each of them, from procuring a grant upon a survey which had been made and returned for the use of James Connor, by virtue of the warrant, under colour of certain assignments alleged by James and Henry Connor to have been made by Hibbits, and to have those assignments set aside.

It appears, that James Connor held a writing under seal, dated the 25th of September, 1796, purporting to be signed and executed by James Hibbits, to the following effect; " I, James Hibbits, of the county of Iredell, and State of North Carolina, for and in consideration of the sum of ninety-three pounds ten shillings, of the State aforesaid, have granted, bargained, and sold, to James Connor, of Meck-lenburgh county, and State aforesaid, a 5,000 acre warrant entered in Colonel John Armstrong's office, No. 394, and I do authorise Colonel William Polke, or any of his deputies, or any other surveyor, to issue the returns, when the land is surveyed, in the name of James Connor."

The execution of this assignment is contested by the bill, which suggests, that a mere order for the delivery of the warrant was given, without any terms of transfer; but its due execution is expressly averred by the answer, and clearly sustained by evidence.

It appears, from the statements of the bill and answer of James Connor, that although this assignment purports to be general and absolute, there was a parol agreement and understanding between the parties at the time of its execution, qualifying its general import. But the parties

differ very materially as to the character and extent of this parol agreement. Both admit that Hibbits was indebted to Connor a sum of money, which it was not convenient then to pay, but they differ as to its amount. Both agree that the sum so due from Hibbits to Connor, and Connor's agreement to pay to government a balance due upon the entry of about twenty-four pounds, with the interest thereon due to the State, and for which the warrant was detained, was the consideration of the assignment. Hibbits insists, that by the agreement and understanding of the parties, the assignment was intended as a mortgage or security for the debt, together with the advance to be made to the government; but Connor, in his answer, expressly denies such was the character of the agreement, and insists it was, that Connor should be proprietor of the warrant, so far as these sums would go, at the rate of sixty pounds per thousand acres, and that the residue should be held by him in trust for Hibbits. It appears that Connor paid to the government 45 pounds, 17 shillings and four pence, the balance due upon the entry, with interest, and procured the warrant to issue, and be delivered to him, on the 29th of November, 1797. It appears, that the adjustment and settlement of their respective interests in the warrant, was the subject of occasional correspondence and negotiation between them from that time until 1817; but that, as the land lay in the Indian country, and could not lawfully be surveyed until the Indian title should be extinguished by the general government, the matter lay over until that period.

It appears that in June, 1817, James Connor sent his son, Henry W. M. Connor, with a power of attorney, and instructions, from North Carolina, to James Hibbits in Tennessee, to adjust the business within, either by selling to Hibbits Connor's interest in the warrant, or purchasing Hibbits' interest in it. That on the        day of June, 1817, at Hibbits' own house, a contract was made by Henry Connor, as agent of James Connor, with Hibbits, by which Hibbits agreed to transfer and assign to James Connor, or his agent for his use, all Hibbits' interest in the warrant, for which Connor agreed to convey to Hibbits by deeds with special warranty, Connor's right in two grants of 1000 acres,

in Connor's name, calling to lie on Swift Creek; and also give a bond for the conveyance of 150 acres in Bedford county; in execution of which agreement an assignment of the whole warrant was accordingly executed by Hibbits, and deeds for the two grants of 1000 acres each, on Swift Creek, and a bond for the 150 acres in Bedford County, were executed by Henry W. M. Connor, as agent for James Connor.

The bill charges that this assignment was procured by Henry W. M. Connor "most fraudulently, and in the following manner:"—"that Hibbits was confined to his bed by a severe and long spell of sickness, under the influence of which he had laboured several months; that his intellect and his faculties were so much debilitated and impaired, that he scarcely knew any thing he was doing; that Henry Connor represented all the lands he proposed giving for the warrant as good and valuable lands; and he moreover represented that the land called for in said warrant lay south of, and without the limits of the state of Tennessee; all of which assertions and allegations of said Henry were false, and known by him to be so at the time. He had been correctly informed that the land lay in this state, (Tennessee,) and that it was very valuable; he had been offered for part of it six dollars per acre, and he also knew that the two tracts of 1000 acres each on Swift Creek had never been surveyed; and that the 150 acres in Bedford county had been taken by a better claim."

This is the substance of the charges of fraud and misrepresentation made in the bill, all of which are substantially denied by the answer.

At the hearing of the cause, the Circuit Court decreed that the assignment of the          day of June, 1817, should be set aside and held for nought; that neither of the Connors should hold any interest in the warrant by virtue of that assignment, and then proceeded to direct what interest the parties should respectively hold in the warrant, under the assignment and contract of 1796, and directed a release of the proportion allotted by the decree to the complainants accordingly.

It is plain that if the assignment of 1817 ought not to be set aside, the decree must be considered not only erroneous

but there can be no necessity for inquiring what interest each party should hold in the warrant under the contract and assignment of 1796, independently of the assignment of 1817. That matter was adjusted by the contract and assignment of 1817; and unless that assignment should be set aside for fraud and imposition, we cannot go behind it.

It is argued that James Hibbits was so diseased in mind and body as to be incapable of controlling his own conduct, and that undue advantage was taken of his imbecility by Henry W. м. Connor. We do not think the allegation supported by sufficient proof. The answer denies it; and William Cawley is the only witness who speaks directly to the purpose. William Alexander swears he was once at Hibbits' house in the summer of 1817; that Hibbits was in great agony, and then incapable of transacting business; but whether from the excess of bodily pain only, or conjointly from that and mental imbecility, he is silent. The former we think the fair and only import of his evidence, as he says nothing of the state of Hibbits' mind, but speaks expressly of bodily disease. Besides, it is uncertain whether this was before or after the contract; and cannot, therefore, furnish a circumstance in aid of Cawley's statements. Many other witnesses depose as to Hibbits' mental condition, whose statements are irreconcilable with Cawley's impressions. A letter written by Henry W. M. Connor to Adam Miller, in which he says, "Mr. Hibbits has found out that I made an advantageous trade with him, that the land was in the state of Tennessee, contrary to his expectation, and complains heavily that I took an advantage of him, that he was a little deranged at the time," is greatly relied on in argument, not only to prove Hibbits' insanity, but to prove Henry W. M. Connor misrepresented the situation of the entry of 5000 acres, and thereby deceived and defrauded Hibbits.

So far as the letter alludes to the state of Hibbits' mind at the time of the contract, and to "an advantage" having been taken of him, the writer evidently means to state only Mr. Hibbits' subsequent complaints, and not the facts or circumstances actually attending the transaction. The letter cannot, then, prove that Hibbits' was deranged, or that Connor took advantage of him, unless it is inferable from other parts

of the letter.   He says, Hibbits had found out that Connor had made an advantageous trade; but it would be a very strained construction of this language, to suppose Connor meant any thing more by it than a good bargain.

He says, Hibbits had found out the land lay in Tennessee, contrary to his expectation; and it has been insisted in argument, that this fixes decisively upon Henry Connor the imputation of fraud and misrepresentation, as to the situation and value of the 5000 acres of land.   We do not think so.   In the very doubtful state of the question, where the state boundary would run, when ascertained by public authority, the various conjectures and opinions then existing on the subject, the near proximity of the land to the line, as afterwards established, no inference unfavourable to the fairness of Connor's conduct can justly be drawn from Hibbits' expectation at the time of the contract that the land was not in Tennessee, unless it were shown that Connor, by his representations, superinduced that expectation.   There is nothing in the letter, and we can discover nothing elsewhere in the evidence, conducing to prove that Connor, at the time of the contract, made any representation on the subject of the land being without or within Tennessee.

In the existing state of circumstances, in relation to the position of the state line, which was not fixed or known until long after, it could at most be but matter of opinion or conjecture, whether the land would or would not fall within Tennessee.   It is not shown that Henry W. M. Connor expressed even an opinion to Hibbits on the subject; and if Hibbits entertained an erroneous opinion, it would be going too far, in a matter, apparently involved, at the time, in uncertainty, to hold Connor responsible for that error.

The bill charges Connor with falsely representing the value of the 5,000 acres; but that is also denied by the answer, and there is no proof in support of the bill.

It is further argued, that the deeds made by Connor to Hibbits for the two tracts of 1,000 acres each, calling to be on Swift creek, being drawn by Henry W. M. Connor, and containing only a clause of special warranty, is evidence of the fraud and undue advantage taken of Hibbits' situation. The clause of warranty in the conveyances is to the follow-

ing effect, to wit: " That he, the said James Connor, for himself and heirs, shall and will warrant and defend the above named grant from the lawful claim or claims of any person or persons whatever; but it is hereby understood that the said Henry W. M. Connor, as agent for James Connor, does not obligate himself to warrant the land called for in the grant, but only to warrant the grant itself from all legal claims of any person or persons."

Whatever singularity may, at first blush, appear in this clause of warranty, it vanishes when the state of the country, and the titles in it, are understood. The 5,000 acre entry of Hibbits, and the land given in exchange for it, in the contract of 1817, at that time all lay in the Indian country, and the Indian title thereon had not been extinguished. Although the warrant upon the 5,000 acre entry had issued, it had not been surveyed, and could not be lawfully surveyed until the Indian title should be extinguished by the general government. Although grants had issued for the two tracts of 1,000 acres each, calling to lie on Swift creek, it was very probable that they had issued, as is understood to have been the case in many instances, without actual surveys having been executed on the grant. By the laws and usages of the State, as understood to exist at the time, duplicate warrants could be procured, and located on other lands, whenever it appeared the land granted could not be identified for want of a survey, or was lost by a superior interfering claim. In such a state of things, it was evidently a risking bargain on both sides ; and the peculiar clause of warranty must be presumed to secure to Hibbits the benefit of procuring warrants for the grants, if the land could not be held by the grants themselves. The same remark may be applied to the 150 acres in Bedford county, with this additional observation, that as Henry W. M. Connor did not execute a deed of conveyance for it at the time of the contract, but a bond for a conveyance, if the 150 acres is lost, or he is otherwise unable to convey, he is liable upon his bond, unless he afterwards made a conveyance agreeably to his bond; and in that case Hibbits would derive the same advantage of being entitled to a warrant for that quantity. notwith-

1827.

Connor
v.
Featherstone

1827.

Edwards'
Lessee
v.
Darby.

standing the opinion of Henry W. M. Connor, as expressed in his letter to Miller to the contrary.

The only remaining ground of argument relied upon in support of the decree of the Circuit Court is, that the consideration agreed to be given for the last assignment has failed, and the assignment ought, therefore, to be set aside. But the consideration agreed upon has not failed. Hibbits, as must be inferred from the deeds for the two tracts of 1,000 acres each, was not to have a good and indefeasible title; but such title only as the grants might give, with the incidental advantages resulting from them by the laws of the country. The 150 acres may constitute a claim for damages, but furnishes no ground for setting aside the assignment of 1817.

This Court is of opinion, there is not sufficient evidence to show that the assignment, dated the          day of June, 1817, was procured by fraud, or undue advantage taken of the situation of Hibbits; and that the said assignment ought not to have been set aside. The decree of the Circuit Court is, therefore, deemed erroneous, and must be reversed, and the cause remanded to the Circuit Court, with directions to dismiss the bill, with costs.

---

[LOCAL LAW.]

### EDWARDS' Lessee *against* DARBY.

Under the act of North Carolina of 1782, for the relief of the officers and soldiers in the continental line, &c., the commissioners having determined that the *French lick* was within the reservations of the statute, as public property, and having surveyed the said reservation in 1784, the same was protected from individual survey and location, although it exceeded the quantity of 640 acres.

The *French lick* reservation has not been since subjected to appropriation, by entry and survey, as vacant land, by any subsequent statute of North Carolina or Tennessee.

THIS cause was argued by Mr. *Talbot*, for the plaintiff, and by Mr. *Eaton*, for the defendant.

1827.

Edwards'
Lessee
v.
Darby.

*Jan. 24th.*

*Jan. 29th.*

Mr. Justice TRIMBLE delivered the opinion of the Court.

This is a writ of error to a judgment of the Circuit Court for the Western District of Tennessee.

The plaintiff prosecuted an action of ejectment in that Court, to recover possession of a small tract of 20 or 30 acres of land, which had been laid out in lots and squares as part of the town of Nashville, the tenants in possession being the owners or occupiers of such lots.

In the year 1818, Patrick H. Darby appropriated, by entry and survey, all that part of the town from lot No. 141, to lot No. 165, the latter inclusive ; and having obtained a grant therefor from the State of Tennessee, he, before the institution of the suit, conveyed the land by deed to Edwards. This was the plaintiff's title.

'The legislature of North Carolina, by an act passed in the year 1782, entitled, " An act for the relief of the officers and soldiers in the continental line, and for other purposes therein mentioned," enacted, that certain bounties in land should be granted to the officers and soldiers in the line of that State, on continental establishment.

The seventh section of the act, after reciting that, " Whereas, in May, 1780, an act passed reserving a certain tract of country to be appropriated to the aforesaid purposes, and that it had been represented to the assembly that sundry families had, before the passing of the said act, settled on the said tract of country, enacts that 640 acres of land shall be granted to each family, or head of a family, and to every single man of 21 years or upwards, (to include their improvements,) settled on said land before the first day of June, 1780, for which they shall have the right of pre-emption ; provided no such grant shall include any salt licks or salt springs. which are hereby declared to be reserved as public property, together with 640 acres of the adjoining lands, for the common use and benefit of the inhabitants of that country, and not subject to future appropriations ; and all the remainder of the aforesaid tract of

country shall be considered as subject to partition as by this act directed."

The eighth section appoints commissioners in behalf of the State, "to examine and superintend the laying off the land in one or more tracts, allotted to the officers and soldiers."

The eleventh section authorizes the commissioners to appoint one or more surveyors, for the more speedy and effectual laying off and surveying said lands.

The commissioners, in the exercise of their powers in carrying this act into effect, determined the French lick to be within the scope of its provisions, and a proper object of such reservation, and caused a survey to be made of said reservation as early as 1784, which turns out to include six hundred and sixty-seven and three quarter acres, instead of six hundred and forty, and embraces within its limits the whole of the lots laid off in the town of Nashville, and the land covered by the grant to Patrick H. Darby.

In the year 1784, the legislature of North Carolina, by its act, appropriated 200 acres, part of said reservation, for the establishment of the town of Nashville, to be laid off at the bluff on the Cumberland river, nearest the French lick; and commissioners are designated in the act to lay out the proposed town in streets, lots, and squares; to cause a plan thereof to be made out; and to sell and dispose of the lots in the town when thus laid off.

Upon the trial of the general issue in the Circuit Court, after the plaintiff had given in evidence the grant to Darby, and conveyance from Darby to Edwards, already recited, the defendants gave evidence conducing to prove that the survey made of the reservation around the French lick, by the commissioners, as early as 1784, included the whole of the land granted to Darby, and then in controversy; and also, that the commissioners, or trustees, for laying off the town of Nashville, had, in the year      laid off and disposed of a part of the town lots; and that, afterwards, the commissioners had laid off and disposed of the additional lots, to 165 inclusive, about the year 1789, or 1790; but it appeared that the quantity of 200 acres was thereby exceeded by 20 or 30 acres, such excess covering the lots

from 141 to 165 inclusive, but the whole of which lay within the French lick reservation, as laid off by the commissioners about the year 1784.

The Court instructed the jury, that if they found the land in controversy, and within Darby's grant, was also within the boundary of the town as actually laid off, although that boundary exceeded the quantity of 200 acres, or if they found it was within the actual survey of the French lick reservation, as laid off in 1784, although it exceeded the quantity of 640 acres, the land was protected from individual appropriation by entry and survey, both by being so within the town boundary as laid off, and within the reservation as laid off, or if not by both, it was so protected by being included within the latter; and that, consequently, the grant to Darby was void.

To this opinion and instruction the plaintiff excepted, and his exception was sealed, and made part of the record.

It is not necessary to decide whether the land in controversy would, or would not, have been protected from individual appropriation by being actually laid off and disposed of as town lots, beyond the quantity of two hundred acres, as we are all of opinion it was so protected by being within the French lick reservation, as laid off.

It is argued, that the commissioners, appointed by the act of 1782, were not authorized to cause surveys to be made of the reservations of 640 acres around the reserved salt licks and springs, that the reservation was by quantity only, and that no legal effect can therefore be attributed to the survey. We admit the statute does not give the authority to survey the reservations, in express terms, but do not admit that the authority may not, and does not, result by necessary implication from the duties they were expressly required to perform, and from the general provisions of the statute. They were not expressly required by the statute to determine what licks and springs were proper objects for reservation, and came within the provisions of the statute; but they were required to lay off and cause to be surveyed the lands granted to the officers and soldiers, subject to, and so as not to interfere with, these reservations. The right of pre-emption granted by law to the settlers, of 640 acres each, including

1827.

Edwards'
Lessee
v.
Darby.

their settlements, were also to be avoided. It seems to result necessarily from these provisions, that the commissioners must first determine what were the proper subjects of reservation, and having determined that a given salt lick or spring came within the provisions of the law, the power and duty of laying off by survey the 640 acres reserved, and to be avoided, around the lick, seems necessarily and irresistibly to result to the commissioners, in all cases where they might deem it necessary to do so, in order to enable them to lay off the lands for the officers and soldiers, so as to avoid these reservations. The adjacency of pre emption rights, too, might render it both necessary and proper that they, as well as the reservations, should be laid off, because both were to oe avoided. But more especially it was indispensable wherever the commissioners were about to lay off lands for the officers and soldiers, adjacent to a salt lick or spring, to hav a survey made of the reservation, to give it figure and fixed locality; otherwise, the reservation being of quantity only, without boundary, one of two consequences must have resulted, namely, that it might, lawfully, be encroached upon on one side, and if on one, on any other side; or that, practically, its uncertainty must have excluded a much larger quantity than was intended by law to be reserved from the satisfaction of the claims of the officers and soldiers.

In the construction of a doubtful and ambiguous law, the cotemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect. The law was not only thus construed by the commissioners, but that construction seems to have received, very shortly after, the sanction of the legislature. By the third section of an act passed by the legislature of North Carolina in 1789, entitled, "An act directing the sale of the salt licks and springs, with the adjoining land, within the District of Mero," it is enacted, that the commissioners appointed to carry that act into effect "shall cause to be surveyed, *where such surveys have not already been made*, all the said salt licks and springs, with the six hundred and forty acres of adjoining land."

This provision must be construed as recognising the validi-

ty of, and as ratifying the surveys which had been made by the commissioners under the act of 1782.

The circumstance of the survey containing a considerable surplus we think immaterial. It was a public act, done by a public authorized agent of the government, and afterwards recognised by the government itself. None but the government itself ought, therefore, to be permitted to call it in question.

It is argued, that, however this may be, the legislature, by the act of 1789, above recited, have declared the whole of the reservation, not otherwise appropriated to the Davison academy, the 200 acres vested in the town, and the land granted to John M'Nairy, to be vacant unappropriated land, subject to individual appropriation by entry, survey, and grant, in the ordinary mode; and that as the land granted to Darby is not embraced by either of these prior appropriations, his grant is valid.

We are not of that opinion. The second section of the act of 1789, directs the County Courts to make out lists " of all the salt licks and springs in their respective counties, which said Courts shall deem fit for the purpose of manufacturing salt, including all such licks and springs as were set apart by commissioners heretofore appointed for that purpose, as public property, viz. Heaton's lick, Denton's lick, the French lick, &c., which lists shall be entered on the records of said Courts, and copies thereof delivered to the commissioners appointed by this act; and all *other salt licks* and springs, with the adjoining lands, not deemed by the Court fit for the manufacturing of salt, be, and they are hereby declared vacant land, and liable to be located and entered in the same manner as other vacant land."

The act then proceeds to direct how the commissioners appointed by that act shall proceed to sell the salt licks and springs, with the adjoining lands, listed as deemed fit for manufacturing salt. From these provisions, it was obviously the intention of the legislature, that all the salt licks and springs deemed fit for the manufacturing of salt, with the adjoining lands to each, shall be sold in the manner specially directed by the act; and the French lick is, by the act itself, enumerated as one belonging to that class.

1827.

Devereaux
v.
Marr.

It was only those not deemed fit for the manufacture of salt, with the reserved lands adjoining them, that were declared vacant land, subject to be appropriated by location and entry. We can discover no other law of North Carolina, or of Tennessee, which subjects the reservation about any of the licks deemed fit for manufacturing salt, to appropriation by entry and survey, as vacant land.

We, therefore, accord in opinion with the Circuit Court, that the grant to Patrick H. Darby is void.

The Circuit Court, as appears by the bill of exceptions, permitted evidence to be given, for the purpose of showing the Court had no jurisdiction ; and instructed the jury, that if they believed the facts which this evidence conduced to prove, the Court had no jurisdiction over the cause. This was certainly irregular and improper. The jury were sworn to try the general issue, and the facts involved in it, not to try facts involved in a question of jurisdiction.

The instructions of the Court were calculated to lead and divert the attention of the jury, from the subjects of inquiry properly before them, to others in no way connected with the issue. For this error, the judgment of the Circuit Court must be reversed, the cause remanded to the Circuit Court, with directions to set aside the verdict, and for new proceedings to be had therein, not inconsistent with the judgment of this Court.

[PRACTICE.]

DEVEREAUX *against* MARR.

This Court cannot take jurisdiction of a question, on which the opinions of the judges of the Circuit Court are opposed, where the division of opinions arises upon some proceeding subsequent to the decision of the cause in that Court.

IN this case, the judges of the Circuit Court of West Tennessee, after a judgment had been rendered in that Court,

divided in opinion upon the question as to the amount of the security bond, to be given by the party applying for a writ of error, whether the amount of the bond ought to be sufficient to cover the whole debt, or only for the costs and increased damages on the party failing to prosecute his writ of error with effect. Whereupon the division of opinions was certified to this Court, under the 6th section of the Judiciary Act of the 29th April, 1802, ch. 291.

1827.

Ogden
v.
Saunders

The cause was argued by Mr. *Eaton* for the plaintiff, and by Mr. *White* for the defendant.

*Jan. 17th.*

THIS COURT was of opinion, that it had no jurisdiction of the question on which the opinions of the judges of the Circuit Court were opposed, the division of opinions having arisen after the decision of the cause in that Court.

Certificate accordingly

[CONSTITUTIONAL LAW.]

OGDEN, Plaintiff in Error, *against* SAUNDERS, Defendant in Error.

The power of Congress " to establish uniform laws on the subject of bankruptcies throughout the United States," does not exclude the right of the States to legislate on the same subject, except when the power is actually exercised by Congress, and the State laws conflict with those of Congress.

A bankrupt or insolvent law of any State, which discharges both the person of the debtor, and his future acquisitions of property, is not " a law impairing the obligation of contracts," so far as respects debts contracted subsequent to the passage of such law.

But a certificate of discharge, under such a law, cannot be pleaded in bar of an action brought by a citizen of another State, in the Courts of the United States, or of any other State than that where the discharge was obtained.

ERROR to the District Court of Louisiana.
This was an action of assumpsit, brought in the Court be-

1827.

Ogden
v
Saunders.

low by the defendant in error, Saunders, a citizen of Kentucky, against the plaintiff in error, Ogden, a citizen of Louisiana. The plaintiff below declared upon certain bills of exchange, drawn on the 30th of September, 1806, by one Jordan, at Lexington, in the State of Kentucky, upon the defendant below, Ogden, in the city of New-York, (the defendant then being a citizen and resident of the State of New-York,) accepted by him at the city of New-York, and protested for non-payment.

The defendant below pleaded several pleas, among which was a certificate of discharge under the act of the legislature of the State of New-York, of April 3d, 1801, for the relief of insolvent debtors, commonly called the *three-fourths act*.

The jury found the facts in the form of a special verdict, on which the Court rendered a judgment for the plaintiff below, and the cause was brought by writ of error before this Court. The question, which arose under this plea as to the validity of the law of New-York as being repugnant to the constitution of the United States, was argued at February term, 1824, by Mr. *Clay*, Mr. *D. B. Ogden*, and Mr. *Haines*, for the plaintiff in error, and by Mr. *Webster* and Mr. *Wheaton*, for the defendant in error, and the cause was continued for advisement until the present term. It was again argued at the present term, (in connexion with several other causes standing on the calendar, and involving the general question of the validity of the State bankrupt, or insolvent laws,) by Mr. *Webster* and Mr. *Wheaton*, against the validity, and by the *Attorney General*, Mr. *E. Livingston*, Mr. *D. B. Ogden*, Mr. *Jones*, and Mr. *Sampson*, for the validity.

*Feb.* 19th,
*20th,* 21st,
*22d.*

The editor has endeavoured to incorporate the substance both of the former and the present argument, into the following summaries.

Mr. *Wheaton* argued, that the State laws now in question were repugnant to the constitution of the United States, upon two grounds:

1st. That the power of establishing " uniform laws on

the subject of bankruptcies throughout the United States," was exclusively vested in Congress.

2d. That the State laws in question were " laws impairing the obligation of contracts," the power of passing which was expressly prohibited to the States.

1. The State laws, the validity of which is now drawn in question, are, the act of the legislature of New-York of the 3d of April, 1801, for the relief of insolvent debtors on the application of three fourths of their creditors, by discharging their persons, and future property, from liability for their debts, upon a *cessio bonorum*, and the act of the 3d of April, 1813, granting the same relief upon the application of two thirds of the creditors. The judgment of one of the learned judges of this Court, in the case of *Golden* v. *Prince*, was referred to in this part of the argument, and its reasoning relied upon, to show that the power of establishing uniform laws on the subject of bankruptcies throughout the Union was, from its nature, an exclusive power, and that the exercise of a similar power on the part of the States was inconsistent.[a]

2. These legislative acts are laws impairing the obligation of contracts. That they are such, in respect to contracts in existence when the laws are passed, has already been determined by the Court upon solemn argument.[b] It was also supposed to have been decided, that, in such a case, it was immaterial whether the contract was made before or after the passage of the law.[c] But the whole question might now be considered as open for discussion.

To determine it, the nature and terms of the constitutional prohibition must be examined. " *No State*," &c. " *shall* coin money, emit bills of credit, make any thing but gold and silver coin a tender in the payment of debts, *pass any* bill of attainder, *ex post facto* law, or *law impairing the obligation of contracts.*" These are comprehensive terms, studiously designed to restrain the State legislatures from

a 5 *Hall's Law Journ.* 502. 503.

b Sturges v. Crowninshield, 4 *Wheat. Rep.* 122. Farmers' and Mechanics' Bank v Smith, 6 *Wheat. Rep.* 131.

c M'Millan v. M'Niell, 4 *Wheat. Rep.* 209.

acts of injustice, both in criminal and civil matters. And (1.)
the prohibition of issuing *bills of credit,* or making any thing
but *gold and silver coin* a tender in the payment of debts,
was intended to cut up paper money by the roots. The
commercial credit of the nation had severely suffered from
this fatal scourge; and the anxiety to be relieved from it,
was one of the most pressing motives which induced the for-
mation of the new constitution. It might, perhaps, be
doubted, whether the power of coining money, which was
given to Congress, and denied to the States, taken in con-
nexion with the prohibition to them to emit bills of credit,
or make any thing but gold and silver coin a tender in the
payment of debts, was not intended to give to Congress the
exclusive power of regulating the whole currency of the
country; although the framers of the constitution probably
did not foresee how completely this provision would be
evaded by the multiplication of banking corporations in the
different States. The term "bills of credit," alone, would
reach the ordinary case of paper money; but the prohibi-
tion of tender laws was meant to expand the same thought
so as to reach valuation and appraisement laws, and all that
prolific brood of similar pernicious enactments which dis-
figure the pages of our history from the peace of 1783 until
the establishment of the present constitution in 1789.
(2.) "Bills of attainder, and *ex post facto* laws," were pro-
hibited, in order to restrain the State legislatures from op-
pressing individuals by arbitrary sentences, clothed with the
forms of legislation, and from making retrospective laws ap-
plicable to criminal matters.[a]  (3.) The prohibition of
"laws impairing the obligation of contracts," was intended
to prevent the remaining mischiefs which experience had
shown to flow from legislative interferences with contracts,
and to establish a great conservative principle, under which
they might be protected from unjust acts of legislation in
any form.

To give complete effect to this last salutary prohibition,
the Court has constantly given it an interpretation sufficiently
broad and liberal to accomplish the ends which the framers

---

a Calder *et ux.* v. Bull, 3 *Dall. Rep.* 386.

of the constitution had in view.  For this purpose the pro-
hibition has been considered as extending to contracts *exe-
cuted,* as well as *executory;* to conveyances of land, as well
as commercial contracts;  to public grants from the State to
corporations and individuals, as well as private contracts be-
tween citizens;  to grants and charters in existence when
the constitution was adopted, as well as those existing pre-
viously, and even before the revolution; and to compacts
between the different States themselves.[a]   In most of these
cases, the impairing act was applied to a specific contract
or grant, and affected only the rights of particular indivi-
duals.   But the principles laid down by the Court apply to
whole classes of contracts;  and surely it will not be pre-
tended, that a law repealing all charters of a certain descrip-
tion, or impairing a general description of contracts, or
abolishing all debts of a certain nature, would not be reach-
ed by the prohibition.   The constitution necessarily dealt
in general terms ; and such is the intrinsic ambiguity of all
human language, that it could not entirely avoid difficulties
of interpretation.   But the fault of tautology has never
been imputed to this instrument, and terms of such signifi-
cant import would hardly have been added to this clause, if
it had been intended merely to repeat and amplify the same
thought which had already been expressed in the prohibi-
tion of paper money, and other tender laws.   On the other
hand, if it had been intended merely to prohibit those par-
ticular species of laws impairing the obligation of contracts,
which the history of the times shows to have been the object
of peculiar censure, they would have been mentioned by
name.   Paper money and tender laws may be, and undoubt-
edly are, laws impairing the obligation of contracts; but
they were such notorious and flagrant evils, that it was
deemed necessary to prohibit them expressly, and by name.
But the Convention would have stopped there, had they not

*a* Fletcher v. Peck. 6 *Cranch,* 87.  New Jersey v. Wilson,
7 *Cranch,* 164.  Terrett v. Taylor, 9 *Cranch,* 43.  Town of Powlet
v. Clark, 9 *Cranch,* 292. Dartmouth College v. Woodward, 4 *Wheat.
Rep.* 518.  Society, &c. v. New-Haven, 8 *Wheat. Rep.* 464. 481.
Green v. Biddle, 8 *Wheat. Rep.* 1.

1827.

Ogden
v.
Saunders.

Ogden
v.
Saunders.

intended to include any, and every law, impairing the obligation of contracts. And if they had intended to include only such as instalment and suspension laws; they would have mentioned them specifically. It is believed that the reasoning of the Court in *Sturges* v. *Crowninshield*, is conclusive on this head. This reasoning receives confirmation from the historical fact, that in the original draughts of the proposed constitution, this prohibition of laws impairing the obligation of contracts was not included, although the other prohibitions were contained both in Mr. C. Pinckney's draught, and in that of the Committee of Nine. The prohibition now in question was subsequently added in the revised draught, which shows, at least, that it was studiously inserted.[b]

Since, then, the Convention intended to prohibit every possible mode in which the obligation of contracts might be violated by State legislation, the question recurs, are State bankrupt laws within the prohibition? The clause must be construed in connexion with other parts of the constitution, and must be considered with reference to those extrinsic circumstances in the then condition of the country which affect the question. One of the great objects of the constitution was to restore violated faith, and to raise the country from that state of distress and degradation into which it had been plunged by the want of a regular administration of justice in the relation of debtor and creditor. The motives for giving the power of establishing bankrupt laws to Congress are explained in the cotemporaneous expositions of the constitution.[c] Had not this power been granted to the Union, it might have been argued with more show of reason, that the States were not meant to be prohibited from exercising the power so as to impair the obligation of contracts. In enumerating the prohibitions to the States, each particular class of laws was not specified, for the reasons before mentioned. The plan of the framers of the constitution excluded this prolixity of detail. Even in

a *Journ. Fed. Convention*, 79. 227. 359.
b *Federalist*, No. 42.

the *Federalist*, the authors have only commented upon such parts as were subjected at the time to popular discussion. Their observations upon the present subject are very general and concise; not, as has been supposed, because the concession by the States was not so extensive as we now contend, but because it was almost universally regarded as indispensably necessary.

It is said, in a learned judgment delivered from a tribunal entitled to great respect, that all contracts are to be construed and executed according to the *lex loci contractus*, and the obligation of the contract is what the law of the place makes it. Hence it is inferred, that the insolvent laws of the State in which any contract is made, form a part of the obligation of the contract.[a]

The principle may be admitted without conceding the inference. It is sought to be illustrated by supposing the law incorporated into the agreement of the parties. But it is only to suppose the clause of the constitution now in question to be also inserted in their agreement, and it will be seen that this imaginary reference of the contracting parties to any particular law, leaves the question just where it found it. To this reasoning may be opposed the authority of another learned judge of the same State, who, though he expresses an opinion that the prohibition ought to be applied to retrospective laws only, repudiates this argument. " For," (says he,) " if parties are to be presumed to contract with reference to existing laws, they must be presumed to mean *laws made in pursuance of the constitution*."[b] And it may be added, that the same argument would apply with equal force to a law making paper money, or any thing else but gold and silver coin, a tender in the payment of debts. But it will hardly be pretended, that the existence of such a law at the time and place where the debt was contracted, would prevent the creditor from recovering it in specie.

It may, indeed, be admitted, that there is a difficulty in distinguishing between the obligation of a contract, and the remedy given by the law to enforce it. It may be admitted,

a Mather v. Bush, 16 *Johns. Rep.* 233. 249. Per Spencer, Ch. J
b Per Kent, Ch. 7 *Johns. Ch. Rep.* 376.

1827.

Ogden
v.
Saunders.

that the States have a right to modify the remedy, so far as respects their own Courts; that the *lex fori* may be changed in many respects; that the process for the collection of debts may be altered; still it does not follow, that a law taking away all remedy whatever, and, in effect, abolishing the debt, would be a valid act. Unless such an act be a law impairing the obligation of contracts, it is difficult to conceive of such a law. Wherever there is a right, there must be a remedy.[a] The remedy may be modified, but it may not be so modified as to impair or destroy the obligation. A discharge of the person only, upon a *cessio bonorum*, under a State insolvent law, may not impair the obligation of his contracts, and may be effectual within the territory of the State, and in the State Courts. But a discharge of the person, and the future acquisitions of property of the debtor, under a State bankrupt law, absolutely extinguishes the debt, and cannot, therefore, be valid in any place where the authority of the constitution of the United States extends. The distinction between bankrupt and insolvent laws is sufficiently clear for all practical purposes. Both in Great Britain and on the European continent, the bankrupt laws are limited to merchants and traders, and the discharge is absolute. On the other hand, both by the insolvent system of England, and the *cessio bonorum* of the countries governed by the Roman civil law, the benefit of the cession is extended to all classes of persons; but it discharges the person only, leaving the subsequent acquisitions of the debtor liable to the demands of his creditors.[b] The *cessio bonorum* does not, therefore, impair the obligation of the contract. It only suspends and modifies the remedy. "Neither a civil nor a natural obligation (says Ayliffe) is dissolved by a *cessio bonorum*; though it produces a good exception in law, and suspends the force of an obligation for a time; the extinguishment of an obligation being one thing, and the ces-

a 3 *Bl. Comm.* 23.

b *Inst. de Act.* s. 40. *Dig.* l. 4. *De cessione bonorum.* 3 *Pothier. Pandect. Just. in Nov. Ord. Dig.* 174. B. 42. *Encyclop. Meth.* art. Jurisprudence, *Cession. Code du Commerce*, art. 568. *Kent's Comm.* vol. 1. p. 396. 16 *Johns. Rep.* 244, 245. note (a) (b).

sation of it another; for, when an obligation is once extinct, it never revives again."[a]

Supposing, then, that the prohibition ought to be construed as extending to State bankrupt laws, what reason is there to believe that the Convention meant to restrict it to laws operating upon existing contracts only? They had already expressly prohibited retrospective laws in criminal matters; and retrospective laws, applicable to civil cases, hardly required any positive and express prohibition. In every system of jurisprudence such laws are considered as contrary to the first principles of natural justice; and even in those countries where the Courts do not feel themselves at liberty to disobey the will of the legislature when clearly expressed, however unreasonable or unjust, they will not give effect to it unless it is thus expressed.[b] Had retrospective laws, affecting vested rights acquired under contracts, been alone intended, more appropriate and restrictive terms would have been used. But, thus limited in its operation, the prohibition would have been wholly ineffectual. The prohibition of paper money, and tender laws, was certainly meant to apply to prospective, as well as retrospective acts. To prohibit debts from being compulsively satisfied with any thing but gold and silver coin, and yet to permit the States to make laws for discharging debts without payment of any kind, is an absurdity of which the Convention cannot be suspected. It is universally admitted, that the prohibition covers instalment and suspension laws. These confessedly involve all the mischiefs meant to be corrected; and yet we are told the States may pass them *ad libitum*, provided they only make them prospective in their operation. The history of the times will show that many of the laws which the Convention must have had in their eye, were prospective, either in effect, or in express terms.[c]

a *Ayliffe's Civ. Law*, l. 4. tit. 1.

b *Bracton*, l. 4. fol. 228    *Dig.* 50. 17. 75. *Code Napoléon*, art. 2. Dash v. Van Kleeck, 7 *Johns. Rep.* 477. 500. *Kent's Comm.* vol. 1. part 3. lect. 20.

c *State Papers*, vol. 1. p. 23. Mr. Hammond's correspondence with Mr. Jefferson.

1827.

Ogden
v.
Saunders.

The prohibition is associated in the same clause with other prohibitions, all intended to promote the same object, that of securing the observance of good faith in matters of contract. " No State shall make any thing but gold and silver coin a tender in the payment of *debts*," or " pass any law impairing the obligation of *contracts*." What *debts?* *All* debts, both those contracted before and after the passage of the tender law. What *contracts?* *All* contracts, both those made before, and those made after the impairing law.

What is this " *obligation* of contracts," which is prohibited from being impaired by any act of State legislation? We answer, it is the civil obligation, the binding efficacy, the coercive power, the legal duty of performing the contract. The constitution meant to preserve the inviolability of contracts, as secured by those eternal principles of equity and justice which run throughout every civilized code, which form a part of the law of nature and nations, and by which human society, in all countries and all ages, has been regulated and upheld. It is said that the obligation of contracts is derived from the municipal law alone: *Obligatio est juris vinculum, quo necessitate astringimur alicujus rœi solvendœ secundum nostrœ civitatis jure.*[a] This is what we deny. It springs from a higher source: from those great principles of universal law, which are binding on societies of men as well as on individuals. The writers on natural law are full of this subject.[b] And the Court itself has given a practical

a *Just. Inst.* 1. 3. tit. 14.

b *Grotius,* (*De J. B de P.*). " On this subject we are supplied with noble arguments from the divine oracles, which inform us that God himself, who can be limited by no established rules of law, would act contrary to his own nature, if he did not perform his promises. From whence it follows, that the obligation to perform promises, springs from the nature of that unchangeable justice, which is an attribute of God, and common to all who bear his image in the use of reason." (B. 2. ch. 11. s. 1 ) " It is a most sacred command of nature, and guides the whole order of human life, that every man fulfil his contracts." (B. 3. ch. 4. s. 2.)

*Burlamaqui.* " It is as ridiculous to assert that before the establishment of civil laws and society, there was no rule of justice to which mankind were subject, as to pretend that truth and rectitude depend on the will of men, and not on the nature of things." (Vol. 2. p. 158.)

*Vattel, Droit des Gens.* " It is shown by the law of nature, that

exposition to the clause, which cannot be reconciled to the supposition, that the obligation of contracts depends alone on the municipal laws of the States. In the case of *Green* v. *Biddle,*[a] it was determined, that certain acts of Kentucky were repugnant to the constitution of the United States, as impairing the obligation of the compact of 1789, between the States of Virginia and Kentucky, respecting the titles to land in the latter State. Here the contract was a treaty between two sovereign States of the Union. Whence was its obligation derived but from the law of nature and nations?

When it is contended that the obligation of contracts depends upon universal law, it is not meant to assert that the State legislatures may not change their present municipal codes. But it is denied that they may change them so as to affect that "*great principle* which the Convention intended to establish *that contracts should be inviolable.*" Many perplexing cases may be imagined, where it would be difficult to ascertain the precise extent of the constitutional limitation upon the power of the States. In a new system of government, so complicated as ours, it will not be easy, nor is it necessary, to adjust by anticipation the precise limits of its conflicting authorities. "Moral lines are strong and broad," and it is not possible to mark them with mathema-

---

he who has made a promise to any one, has conferred on him a true right to require the thing promised; and that, consequently, not to keep a perfect promise, is to violate the right of another, and is as manifest an injustice as that of depriving a person of his property. There would be no more security, no longer any commerce between mankind, did they not believe themselves obliged to preserve their faith and to keep their word. This obligation is then as necessary, as natural, and indubitable, between the nations that live together in a state of nature, and acknowledge no superior on earth, to maintain order and peace in their society." (B. 2. ch. 12. s. 163.)

*Pothier, des Obligations.* "Natural law is the cause, mediately at least, of all obligations; for if contracts, torts, and quasi torts, produce obligations, it is because the natural law ordains that every one should perform his promises, and repair the wrongs he has committed." (Pt. 1. ch. 1.)

a 8 *Wheat. Rep.* 1.

b Sturges v. Crowninshield, 4 *Wheat. Rep.* 206.

1827.

Ogden
v.
Saunders.

tical precision. What we insist upon is, that the prohibition was designed to guarantee to the people of the whole Union, of each State, and to foreigners, the inviolability of contracts, the impartial administration of civil justice, the observance of good faith, that ligament of the social union, so as to enforce the execution of agreements in some effectual mode. The prohibition is universal. All manner of contracts are included in it, and their obligation is forbidden from being impaired by any legislative act whatsoever. " No State shall pass *any law* impairing the obligation of contracts." It is not merely any law impairing a particular contract, but it is any law impairing the *obligation*, or binding efficacy of contracts in general. It is any such law, general or special, applicable to a specific contract, or to all contracts, or to a particular class of contracts ; to contracts made between citizens of the same State, or with citizens of different States, or aliens ; between the State and individuals or corporations, and between the States themselves ; whether the contract was in existence when the constitution was adopted, or subsequently made ; and (as we contend) whether the law was made subsequent to the contract, or the contract to the law. It has, indeed, been attempted to carve out of the universality of the prohibition, an implied exception of such laws as were in existence when the constitution was formed, or which the States had been accustomed to pass in the ordinary course of their domestic legislation. But nothing can be more arbitrary than this distinction. It is said, that insolvent laws were in existence when the constitution was formed and adopted, and had existed from very early colonial times. So were paper money and tender laws, instalment and suspension laws. Yet these are confessedly meant to be prohibited ; and whenever such laws have been inadvertently or designedly passed by any State since the adoption of the constitution, no care has been taken to make them prospective only in their operation. If it be said that paper money and tender laws are *expressly* prohibited, the answer is, that the extent of the prohibition does not depend upon the particular kind of law being specified ; but that, if it is once ascertained that any law falls within the general prohibition, its being limited to future cases only will not rescue

it from the grasp of that prohibition. The general legislative power of the States over contracts is left untouched by the clause in question. The States may still provide what shall, and what shall not, be the lawful subject of contracts; in what form they shall be made, and whether in writing, under seal, or by parol; and by what solemnities they shall be attested; who may contract, and who are disabled from contracting; what contracts are forbidden by the policy of the State, either as respects its internal commerce, its police, its health, its finances, its morals. In short, the dominion of the States over the entire field of civil legislation is complete, except so far as it has been surrendered, expressly, or by fair implication, to the national government, or as its exercise is expressly prohibited to the States. But still the question recurs, how far has it been surrendered, and how far has its exercise been thus prohibited? The States may enact laws forbidding certain kinds of contracts from being made: or any contract being made by certain individuals; or requiring them to be made in certain prescribed forms, and attested with certain solemnities, and proved by certain species of testimony. Contracts made contrary to these regulations may be void in their inception, and never have a legal obligation; or those which are permitted to be made, may be discharged by performance, by payment, or by prescription and the presumption arising from the lapse of time as a rule of evidence. The States may make any and all regulations respecting contracts, provided they do not include among these regulations a provision that lawful contracts shall have no obligation. The constitution makes the binding obligation an inseparable incident to the contract. Without doubt, the supreme power of the nation may make laws impairing the obligation of contracts. Congress, not being prohibited in the constitution, may make laws having that effect, wherever it is a necessary consequence of the exercise of any legislative power given by the constitution. Thus, the warmaking power necessarily involves in its exercise the dissolution of contracts of affreightment, and charter party, of insurance, and partnership, and other conventions connected with a commercial intercourse with the public enemy. But the radical vice of the opposite argument consists in assu-

1827.

Ogden
v.
Saunders

1827.

Ogden
v.
Saunders.

ming that the States are supreme in respect to this matter. They have parted with the power of making all laws impairing the obligation of contracts, and they have given the power to Congress, so far as it is involved in the enactment of bankrupt laws, or of any other law which Congress has authority to make.

As to what may be said in respect to the consequences of the decision the Court is called upon to pronounce, they have been very much exaggerated in all the discussions which have taken place on this subject.   Few of the States have ever had bankrupt laws.   Most of them have confined their regulations to a discharge of the person only.   Others have already modified their insolvent laws, and conformed them to the recent decisions of this Court.   There is a general disposition to acquiesce in those decisions.   The person of the debtor is every where free.   The statute of limitations is fast obliterating stale demands : and it is consolatory to believe, that although the perseverance of this high tribunal, in its former resolutions, might be attended with some temporary and partial evils, they would soon find their appropriate remedy in the exertion of the constitutional power of Congress.   Whatever difficulties may attend the question, relating to a uniform code of bankrupt laws, they must ultimately be overcome by the legislative wisdom of the country.   The establishment of such a code is imperiously demanded by our peculiar situation as a confederacy of numerous States, closely connected by an active commercial intercourse. with various partial and conflicting regulations concerning the relation of debtor and creditor ; by the policy of reciprocating the laws of foreign countries upon the same subject ; and by the general interests of commerce, interwoven as they are with our grandeur and power as a nation, and with all the sources of public and private prosperity.

The *Attorney General*, Mr. *E. Livingston*, Mr. *Clay*, Mr. *D. B. Ogden*, Mr. *Jones*, Mr. *Sampson*, and Mr. *Haines*, argued, *contra*, (1.) that the power of establishing "uniform laws on the subject of bankruptcies throughout the United States," as given to Congress in the constitution, was not exclusive of the States over the same subject. (2.) That the laws of the

State of New-York, now in question, were not laws " impairing the obligation of contracts," in the sense of the constitution.