*Judge Wright
delivered the opinion of the court:
The case presents the two following as the main questions for the decision of the.court:
1. Whether judgments of the Circuit Court of the United States ■in Ohio are liens upon land, and to what extent?
2. Whether the sale upon the junior judgment, under which the •plaintiff claims, vests in him a title discharged of the prior judg•ment in the state courts ^
1. This court determined in Roads v. Symmes et al., 1 Ohio, 261, that the judgments of a court of record operated as a lien upon the real estate of the defendant. This is a principle of law, say ■the court, which “has been acted upon from the commencement of .the administration of justice in the country,” and say the court also,'“it is equally well settled that the lien is co-extensive with •the territorial jurisdiction of the court that renders the judgment. The general court of the territory exercised its jurisdiction, and sent its process,'original and final, into' any county in the territory. The judgments rendered by it were, of consequence, a lien ■ or a charge upon the lands owned by the defendant anywhere, in the territory.” In McCormick v. Alexander, 2 Ohio, 65, this court say, that “ in the state of Ohio, from its first settlement, judgments i have operated as liens upon lands and real estate of the judg *365 ment debtor. Lands have always been liable to be sold on execution.”
The process act of -Congress, temporarily passed in 1789, ancD made permanent in 1792, 2 U. S. Laws, 72, 300, provided that until further provision should be made in that or other acts of the-United States, the forms of writs and executions, and modes of ' proceeding in the circuit and district courts of the United States, in suits at common law, should be the same as was then (1789) vsedf in the Supreme Courts of the same, and when different kinds of execution were issuable in succession, a ca. sa. being one, the plaintiff might take out that writ in the first instance. Section 14 of the United States judiciary act of 1789, 2 U. S. Laws, 62, conferred upon the courts of the ^United States “ power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute which may be necessary for the exercise of their respective jurisdictions and agreeable to the-principles and usages of law.” Section 18 authorizes these courts.to stay execution in certain cases, in order to give time to move-for a new trial. Section 34 declares “ that the laws of the several states, except when the constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decisions on trials at common law, in the courts of the-United States, in cases, where they apply.” The act of 1793, in addition to the last-mentioned act, 2 U. S. Laws, 367, provides that when it is required by the laws of the states that goods taken in execution on a fi. fa. shall be appraised previous to sale, it shall' be lawful for the marshal to summon three appraisers, and for them to appraise any goods taken on a fi.fa. issued by the United States courts, in the same manner as if the writ had issued out of a state court. The act further to regulate processes in the courts of the United States, passed May 19, 1828, Acts 1st Sess. 20th Con. 56, in section 1 adopts the forms of mesne process used at that time in-the highest court of each of those states, which have been admitted into the Union since September 29,1789 (except in Louisiana), for-the courts of the United States in those states, subject to such alterations as said courts should deem expedient, and to such rules as the Supreme Court should adopt. Section 3 adopts into the United States courts in each of those states, in like manner, “ writs of execution and other final process,” “ and the proceedings-thereon ” then [May 19, 1828] used in the courts of the state, re *366 serving to the United States court power, “by rules of court, so far to alter final pr ocess in said courts as to conform the same to .any change which may be adopted by the'legislatures of the respective states for the state courts.” These provisions, it is believed, embrace all the legislation of Congress bearing directly upon the question under consideration.
*The act of 1789 was not applicable to the Ohio district. Neither the district nor state was then formed. The territory, now the State and District of Ohio, was then subject to one incipient organic law of the United States, adapted to the lowest grade of territorial communities. That act adopted the forms of process, etc., used in the Supreme Court of each state in 1789. The State of Ohio was formed in 1802, the District of Ohio in 1803. In 1789 it had no Supreme Court, nor any process then in use in such court. The subject • of the lien of judgments in the United States courts has been looked upon by the profession as awexatious one, but we are not aware of the •question now to be decided having been before any of the courts. The act of May, 1828, we do not think, with the counsel for the plaintiff, removed all difficulties. It is supposed to be prospective in its operation, and not to affect the judgment of 1822, and levy in 1823, under which the plaintiff makes title. That act very materially alters the act of 1788. It adopts in those states admitted into the Union since that time, the mesne process and modes of proceeding used in the highest courts of the state, May 19, 1828; while it adopts for all the states in the Union, no matter when admitted, the final process and proceedings used in the courts of the state at that time. It will doubtless exert a salutary influence upon the practice in the federal courts. While the act evinces a désire in the general government to conform the practice of its judicial tribunals to that of the states, it properly forbears to adopt the changes which the states may make, leaving such changes to be by the courts adopted into the practice if deemed expedient.
The laws of Ohio in force when the judgment in question was rendered in the circuit .court, make judgments in the state courts liens upon lands from the first day of the term on which they were rendered in the courts where the judgment was taken. It is contended, and we think successfully, that the acts of the Ohio assembly, in their terms, *only establish the lien of judgments of the courts of the state. Those laws were enacted as rules for the Ohio courts. The legislature, in the very nature of *367 things, could only intend to enact laws upon subjects within their constitutional jurisdiction, not to embrace subjects and tribunals especially confined to another and distinct government. Such laws do not by their mere enactment, become rules for the courts of the United States. For rules to govern the proceedings of these courts, we must look to the Congress, and to the judicial decisions or rules of the courts of the United States themselves. Judgments are not liens upon lands at common law. Such liens are the creatures of positive statute. The Supreme Court of the United States in Parkin v. Scott, 12 Wheat. 179, recognizes this position, and holds such liens to have capacity to bind and- hold land so long as the statute preserves them in force. This court, in McCormick v. Alexander, 2 Ohio, 65, adjudge that judgments are not of themselves liens upon either real or personal property. They depend upon legislative enactment, are varied from time to time as policy dictates, and the provisions on the subject differ widely in different states. 4 Kent Com. 428-430; 2 P. Wms. 491.
In the United States v. Worson, 1 Gall. 518, the circuit court -determined that section 34 of the judiciary act of 1789, making the state laws rules of decision in the courts of the Union, did not apply to the process and proceedings in those courts.
In Palmer v. Allen, 7 Cranch, 564, the Supreme Court of the United States held that the process act of 1789 did not give efficacy to the laws of Connecticut touching the mode of' executing processes in the United States courts, or impose upon the officers of the United States an obligation to conform their conduct to those laws.
That court, in Robinson v. Campbell, 3 Wheat. 212, held that the remedies in the courts of the United States, at common law and equity, are to be, not according to the practice of state courts, but according to the principles of common law and equity, as distinguished and defined in the country from whence we derive our knowledge of those principles.
*In Wayman v. Southard, 10 Wheat. 1, that court held that Congress had the exclusive authority to regulate the proceedings in the courts of the United States, and the states have no authority to control these proceedings, except so far as the state process acts are adopted by Congress or by the courts of the United States; that the proceedings on executions in the courts of the United States were to be the same in each state as were used *368 in the Supreme Court of the state in September, 1789, subject to* such alterations and additions as said courts may make; that a state law regulating executions, enacted subsequent to September," 1789, is not applicable to executions upon judgment rendered by thej courts of the United States, unless expressly adopted by the regulations- and rules of those courts. Judge Marshall, in giving the opinion of the court, makes the following remarks upon the origin of the acts of Congress of 1789, 1792-3, page 46: “ Congress, at the introduction of the present government, was placed in a peculiar situation. A judicial system was to be prepared, not for a consolidated people, but for distinct societies, already possessing distinct systems, and accustomed to laws which, though originating in the* same great principles, had been variously modified. The perplexity arising from this state of things was much augmented by the circumstance that in many of the states the pressure of the moment had produced deviations from the course of administering justice between debtor and creditor, which conflicted not only with the spirit of the constitution, and consequently with the views of the government, but also with what might safely be considered as* the permanent policy as well as interest of the states themselves. The new government could neither entirely disregard those circumstances nor consider them as permanent. In adopting the temporary mode of proceeding with executions then prevailing in the several states, it was ju'oper to provide for the return to-ancient usage, and just as well as wise principles, which might be expected from those who had yielded to a supposed necessity in departing from them. Congress probably conceived that this object would be best effected by placing in the courts of the Union the power of altering the modes of proceeding in suits at common law, which includes the mode of proceeding in the *execution of their judgments, in the confidence that in the exercise of this power the ancient, permanent, and approved system would be adopted by the courts, at least as soon as it should be resorted to In the several states by their respective legislatures.” He held it extravagant and utterly inadmissible to maintain that the practice of the federal courts, and the conduct of their officers, would be indirectly regulated by state legislatures by acts professing to regulate state courts.
And in U. S. Bank v. Halstead, 10 Wheat. 64, that court thought that'to permit a marshal to be governed or controlled by the state *369 law, would be not only delaying proceedings against the act of Congress, March 2, 1793, 3 U. S. Laws, 367, but might entirely defeat the effect and operation of the execution, and would be inconsistent with the advancement of justice. The court decided “ that the circuit court had authority to alter the form of the process of execution, so as to extend to real as well as personal property; when, by the laws of Kentucky, lands were made subject to like process from the state courts; and, that the act of the general assembly of Kentucky does not operate upon, and bind, and direct the mode in which executions should be enforced by the marshal, so as.to prohibit the sale of land levied upon, unless it commanded three-fourths of its value, according to the provisions of said act.”
These decisions, taken by themselves, would seem to settle the-question, so far as it regards the acts of the Ohio legislature, against the plaintiff; for it will not be pretended, that the law applicable to the acts of Connecticut, or to the exocution laws of Kentucky, are not equally applicable to the laws of Ohio of the-like nature.
But the Supreme Court, in Waring v. Johnson, 1 Pet. 571, say, it has been the uniform course of that, court, with respect to the titles to real property, to apply the same rules that are applied by the state tribunals in like cases. And in Ross v. Doe et al., 1 Pet. 664, it is held, that where a practice has obtained in a state affecting titles to land, even if derogatory to the principles of the common law, the court would regard it, in cases affecting property in such state, if it did not contravene any act of Congress.
*Mr. Justice Johnston, in delivering the opinion of the court, in Fullerton v. Bank of United States, 1 Pet. 612, says: “ The district court of Ohio, which was created.in 1803, and exercised' circuit court jurisdiction, and had power to create a practice for its own government, did not create a system for itself, but finding one established in the state, in the true spirit of the policy pursued by the United States, proceeded to administer justice according to-the practice of the state courts; or in effect adopted, by a singlerule, the state system of practice, etc. So that when the Seventh circuit was established, in the year 1807, the judge of this court, who was assigned to that circuit, found the practice of the state courts adopted, in fact, into the Circuit Court of the United States. It has not been found necessary to make any material alteration since ; *370 but as far as it was found practicable and convenient, the state practice has, by a uniform understanding, been pursued by that court, without having passed any positive rules on the subject.” Again, he says: “ Written rules are unquestionably to be preferred, because their commencement, and their action, and their meaning are most conveniently determined; but what want of certainty can there be, when a court, by long acquiescence, has established it to be the law of that court, that the state practice shall be their practice, as far as they have the means of carrying it into effect, •or until deviated from by positive rules of their own making. ■Such, we understand, has been the course of the United States court in Ohio for twenty-five years past. The practice may have begun, and probably did begin, in a mistaken construction of the process act; but then it partakes of the authority of adjudication. But there was a higher motive for adopting the provisions of this law into the practice of the court, etc., which must often occur in & court in which the remedy is presented by one sovereign, and the law of the contract by another. It is not easy to draw the line between the remedy and the right, where the remedy constitutes -so important a part of the right.” “ But what is the course of prudence and duty when these cases of difficult distribution as to power and right present themselves ? It is to yield rather than •encroach; the duty is reciprocal, and will no doubt be met in the spirit of moderation and comity. In the ^conflict of power and opinion inseparable from very peculiar relations, eases may •occur in which the maintenance of principle, and the administration of justice according to its innate and inseparable attributes, may require a different course, and when such cases do occur, our courts must do their duty; but until then, it is administering justice in the true spirit of the constitution and laws of the United States, to conform, as nearly as practicable, to the administration •of justice in the courts of the state.”
We are certainly disposed to meet this, as well as every other question, “in the spirit of moderation and comity.” It is unquestionably the province of the tribunals of the Union to expound the constitution and laws of the Union as applicable to themselves; and with this it is neither our wish nor purpose to interfere. We shall always feel gratified to find the decisions of those respectable tribunals, upon the grave and important questions before them, in perfect harmony with each other. We have *371 ho desire either to arrogate to ourselves power that does not belong to us, to surrender any that does, or to detract from that of •other tribunals. The case- in 1 Peters is the only one we believe where the origin of the practice in the United States courts in ■Ohio is expressly alluded to. We are not aware that any express and positive rule of those courts was ever made, adopting the execution laws • of the state and the proceedings under them, as the law of those courts; but the practice oí one member of this court for many years at the bar of those courts, gave him opportunity to know that those laws have been repeatedly adjudicated upon in those courts as affecting both original and ’final process there. .Sales upon execution have been, most generally, for years, examined as to, their conformity with the state laws, and confirmed or set aside as found to conform. Relying, then, upon the exposition by the Supreme Court of the United States of the practice and proceedings of the circuit court oí Ohio, and our own observation •of its course of proceeding, we may regard the execution laws of the State of Ohio as adopted into the practice of that court, and .as the law thereof. The doubts we have on the subject yield the more readily, where we are only called upon to give to the judgments and proceedings *of the circuit court of the United ■States the ordinary effect and operations of the judgments and proceedings of our own courts, and to give to the act's of our •own legislature effect as the rule of proceeding in the courts of the United States. The profession has almost uniformly acquiesced in the practice of considering the judgments of the circuit court as having the same lien throughout the state that judgments in the state courts have; in the courts where rendered. ■Strong evidence of this asquiescence is found in the fact that no question of this kind has before been agitated in our courts. Property to an immense amount has changed owners under this practice, and we are disposed to look upon it as a law of property established among us, which is not now to be question ed.
2. The act of February 4, 1826, 22 Ohio L. 114, provides that no judgment theretofore rendered, or which might be thereafter rendered, on which execution had not been taken out and levied before the lapse of a year from the date of the judgment, shall, operate as a lien to the prejudice of any other bona fide judgment creditor. This act, upon full argument, was determined by this ■court in McCormick v. Alexander, 2 Ohio, 65, to be constitutional *372 and operative, both as it regarded judgments rendered before and those rendered after its passage. The court has also decided that unless execution issued according to its provisions and was levied within a year after judgment, the lien of the judgment was taken away, as to subsequent bona fide judgment creditors who had sued out execution and made a levy. In Patton v. Sheriff of Pickaway, 2 Ohio, 395; Earnfit v. Winans, 3 Ohio, 136, and Shuee et al. v. Ferguson, 3 Ohio, 137, the court decided that where there are several judgments, and the property in question has not been levied on • within the year under either of them, they stood on equal footing, and the creditor who first takes out execution and causes a levy to be made, will have the preference. If execution on an older' judgment has not been levied within a year on a particular piece of property, and an execution upon a junior judgment has been levied on that property within the year, the junior judgment will have the preference, though a levy *may have been made on the same property under the older judgment before the levy was made upon the junior judgment. The prior lien ceases to bind the subject of it, in all cases where it is displaced by act of the party, or by provision or operation of law. The judgment under which the defendant claims was rendered August 14, 1821, but was not levied on the lots in dispute until February 8, 1826 ;• that under which the plaintiff claims was rendered January 8, 1822, but not levied until August 20, 1823. Neither of them were levied within a year from their date, and no lien was preserved on either by the judgment alone. Each, after the year, depended for preference solely upon execution and levy. The execution under which the plaintiff claims was levied more than two years before that under which the defendant claims, and the priority of the judgment in the circuit court is thus established. The sale to the defendant did indeed vest in him all the right of the judgment debtor, but that right was subject to the lien on the execution from the United States Circuit Court.
The defendants insist that the venditioni upon which the sale to the plaintiff was made, is void because it has no fi. fa. and levy upon which it is predicated. This position is based upon a variance in the amount stated in the vendi. from that of the recovery in the circuit court. Without explanation this objection might avail the party; but in the case in hearing the objection is entirely removed by the agreed case. By this it is admitted that *373 •the vendí, was issued upon the same judgment on which the levy ■was made. .
In case the claim of the plaintiff is sustained the defendants ■elaim compensation for improvements under the occupying claimant laws. This claim is well founded. The defendants are possessed without bond under a judicial sale, and against this the .plaintiff sets up a better title. The defendants have a right to compensation for improvements made before suit brought.
The court find the defendant guilty of the trespass, etc., and assess the plaintiff’s damage to six cents; but in order to draw a jury to assess the value of the improvements, the cause is ordered to be continued in the county of Warren.