# DECISIONS

OF THE

# Supreme Court of Florida,

## AT MARCH TERM, 1866, HELD AT MARIANNA.

---

W. H. KIMBALL, SHERIFF OF JACKSON COUNTY, VS. J. W. L. JENKINS, ADM'R. OF WILLIAMS DANIEL, DEC'D.

1. The lien of an execution issued and placed in the hands of the Sheriff, in the lifetime of the defendant, is not affected by the death of the latter, but is preserved in full force and to be regarded in the administration of the estate.

2. The words "all other claims and demands" occurring in the act of 1853, are not to be construed as vacating prior existing liens, whether the same arise from contract, or are given by operation of law.

3. An act in derogation of the common law, or of a previous statute, is to be construed strictly.

Appeal from Leon Circuit Court, by consent, heard and decided at Marianna.

A statement of the case is contained in the opinion of the court.

*George S. Hawkins*, for Appellant:

Crane, Boylston & Co. obtained a judgment against Williams Daniel, and upon which an execution issued and was lodged in the hands of Kimball, Sheriff, in *the lifetime of*

15

*Daniel.* On the death of Daniel, Jenkins became the administrator of his estate, and during the last winter Kimball levied upon twenty bales of cotton which were duly advertised for sale. A suggestion of insolvency of the estate was then made by Jenkins, the administrator, and who also then applied for an injunction to arrest the sale on the ground of the alleged insolvency. The injunction was granted by the Judge of the Middle Circuit, and the case comes before the court on appeal from this order or decree.

It is contended that the act of 1853, as to the insolvency of estates, places all debts, save the few enumerated, on the same footing, and that the assets of the estate are to be distributed *pro rata*, and that whatever lien existed by force and effect of the *fi. fa.* and levy *previously*, was annihilated by the act aforesaid, (1853.)

I assume the *negative* of these propositions and contend, 1st, that the lien of the execution after it reached the hands of the Sheriff, *was not* and *could not* be divested except by some act of the creditor himself.

2d. That by the levy, the property was altered, or at least so changed, that the administrator Jenkins held it *cum onere*, viz : the lien of the execution of Crane, Boylston & Co.

3d. That this lien so acquired is not divested by the act of 1853.

This question is presented by the facts : *Does the report of insolvency cut out the lien of the execution of the creditors upon the property levied on ?*

The origin of the law of lien has been ascribed to the law of Rome. Possession as a general rule seems to have been a pre-requisite, but this in many cases has been dispensed with, and Courts of Equity and *statutory enactments* have in many cases allowed the exercise of this right where this does not exist, such as the lien upon real estate for the price, the liens of judgments, implied liens in cases of trust, stoppage *in transitu*, and others. Cross on Lien, 4, 5, 6. The

Kimball vs. Jenkins—Statement of Case.

principles of the law of lien are based upon equitable principles and that "natural justice" of which Lord Mansfield speaks on 4220 of Burr. Reports, and it must be admitted, that when they have *once attached*, they are not annulled or obliterated till they have consummated the object and fulfilled the end of their creation. "Lien, in its proper sense, is a right which the law gives; although it is usual to speak of lien by *contract*." 2 *Bland's ch. R.* 542.

In support of my first general proposition, I say, that this lien is a *statutory lien* created by our statutes. The act of Charles 2d, C. 3, §16, giving this lien, was adopted by our own acts, (Thomp. Dig. 21,) and by this adoption became as binding and as much in force as though embodied *in totidem verbis* among our statutes. See Love vs. Williams, 4 Fla. R. 133; Tidd's P. 1000, 1001; Sewell on Sheriff, 249.

*Effect of a statutory lien.*

"A statutory lien is as binding as a mortgage," &c., says Ch. J. Marshall in Rankin vs. Scott, 12 Wheat. 177. So Judge Sharkey, Dye vs. Bartlett, 7 How. (Mis.) 277. Mosely vs. Edwards, 2 Fla. R. 438, 439. Rutledge vs. Rutledge, 1 McC. Ch. R. 471.

2d general proposition. "That the property was altered by the levy," &c.

To sustain this proposition I cite Love vs. Williams, 4 Fla. 134. Burney vs. Boyett, 1 Howard Mis. R. 42. Ladd vs. Blount, 4 Mass. 402. Hotchkiss vs. McVickers, 12 John. 403. Sewell on Shff., 247. 2 Pickens, 586. Lucas vs. Nickels, 10 Bingham, 182. 1 Lord Ray., 174. Catlin vs. Jackson, 8 John. 427. The property becomes changed after *execution executed*, which means *levied*. See 3 Bacon's Abridgment, 705. Dew vs. Young, 7 Hols'd, 300. Barnes vs. Billington, 1 Wash. C. C. R. 37. Coward vs. Atlantic Ins. Co., 1 Pet. 441.

After goods are seized by a Sheriff, he may maintain trespass or trover. Sewell on Shff., 252, and in New York a

levy on personal property sufficient to satisfy a *fi. fa.* is an extinguishment of the debt. *Ex parte* Lawrence, 4 Cow., 417, and there are decisions in other States to the same effect.

An execution was called by Lord Coke "the life of the law," and Mr. Adams, in his most valuable work on Equity, classifies executions among imperfect mortgages. Adams' Eq., 523, (129), and with civilians they are termed *judicial hypothics.*

3d *general proposition.* That the lien acquired by the levy of the execution is not divested by the act of 1853. *Vide* Haynsworth vs. Frierson, 11 Rich'd Law R. 476. Rutledge vs. Rutledge, 1 McC. Ch. R., 471. Commissioners vs. Greenwood, 1 Des., 450. Brown vs. Gilliland, 3 ib. 542.

In Alabama, with a statute very like ours, it was held, that the lien of an execution is not affected by the death of the debtor, though his estate is reported insolvent. Carpenter vs. Martin, 5 Ala., 217.

In Kentucky, statute precisely like ours, viz : Charles 2d, it was held that the lien was as absolute *before* levy as after it. Savage vs. Best, 3 How. U. S., 318, 320.

In Tennessee the lien of an execution is not affected by the statute of that State of 1833, abolishing the different grades of dignity in debts against the estates of deceased persons. Black vs. Planters Bk., 4 Humph., 367.

The fact of insolvency of estate does not affect the right of widow to dower. Allen vs. Allen, 4 Ala. R. 556.

Dye vs. Bartlett, 7 How'd (Mis.) 224.

*Dye vs. Bartlett,* 7 Howard, (Mis.) R. 224. This case is very like the one at bar; the statute of Mississippi as to insolvent estates being substantially the same as our own. The opinion of the court is pronounced by Judge Sharkey with his accustomed ability.

Williams vs. Benedict, 8 Howard U. S. R., 111. In this case will be found the statute of Mississippi, and the Supreme

Court of the U. S. had in review before it Dye vs. Bartlett, and which they approved and endorsed.

It is very clear, that executions issued in the *lifetime of the debtor* can be levied on the property of the testator or intestate, or " in whose hands soever they may be found." An execution is an entirety, continuous, cannot be superceded after once begun, and is the *same as if executed* or *levied in the lifetime* of *the defendant.* *Vide* Erwin vs. Dundas, 4 How'd U. S. R., 58, 75 ; 13 ib. 287. 4 *Comyn.* Dig., 248, text and note F. 3 *Bacon's* ab. 704.

It must be borne in mind, that this levy took place *before* the suggestion of insolvency. Not that this, as seen above, creates any difference, for the lien once acquired adheres until divested by the act of the creditor ; but the property being changed by the levy, the administrator comes into possession of it subject to the claim or incumbrance of the levy.

This is denied—but it must be remembered that the administrator stands in the place of the intestate ; he represents him in every respect and is substituted for him, but he holds *en auter droit.* 1 Williams on Ex's, 406. Is the property *after the lien has attached* any more free, or does the administrator stand in any better situation than the intestate ? The administrator is to administer all the goods, &c., that come to his hands to be administered—*how come ?* Of course, come as they were, with a lien upon them as binding as a statute can make it, and *as binding as a mortgage.* My clients have this lien, a *quasi* right to the property, which they have not yielded up, surrendered or impaired by any act of their own. Bland's Chancery, 449, 452. And this lien cannot be divested by any act of the debtor. Lambert vs. Paulding, 18 John., 311, 363.

Again, by way of *analogy.* The laws of the United States giving priority. to the government in cases of *insolvency,* *though there is no saving clause as to prior liens or incum-*

*brances*, yet these are preserved with a strong hand. Dunlop's laws U. S. 227.

The priority of the U. S. is divested by a *bona fide* conveyance, mortgage or seizure under a *fi. fa.* Thilasson vs. Smith, 2 Wheat., 396. 3 Cranch, 373. Specific lien on goods preserved, 1 Peters, 386. Coward vs. Pacific Ins. Co., 6 Pet., 262. Brent vs. Bk. Washington, 10 ib. 596. U. S. vs. Mechanics Bk., Gilpin's R. 54. And specific lien on goods is preserved, 1 Peters, 386.

*Review:*

I have shewn,

1st. That an execution being a statutory lien is as binding as a mortgage.

2d. That by the levy, the property is altered and a *quasi* property vests in the Sheriff for benefit of creditor.

3d. That this lien or binding efficacy of the execution is not affected by the death of the party, but that it is an entirety, and remains the same as if levied in the lifetime of the intestate Daniel.

I have sustained these views and principles by decisions of other States having similar statutes to our own as to insolvent estates, and by the most cogent analogies drawn from the decisions of the Courts of the United States.

In all contests between creditors, though this is not really one strictly, the maxims of *prior est tempore, potior est jure*, and *vigilantibus non dormientibus jura subvenient*, apply. I do not quote these sharp and notable maxims, because I wish to enter upon a *race* where the foremost secures the first and best rights, but simply because I contend that my clients have certain rights *vested* in them by *law*, not to be divested by matter *ex post facto*. Such a divestiture would be against all constitutional restrictions, all ideas of right and justice, and shocking to one's moral sense. To confer a right and then to take it away, to give a remedy containing in it all the force and validity of a contract, to declare a

Kimball vs. Jenkins—Statement of Case.

priority and then to say they must yield to debts of inferior degree or quality, and all this by the phraseology of a general act and most ambiguous statute, would create such legal anomalies, that a court would disregard its provisions unless made more clear and lucid; but on the contrary, it necessary to avoid its deleterious effects, would be astute in endeavoring to give it such an interpretation as would be compatible with law, reason and justice.

Statute of 1853.

At the first blush it would seem to carry with it as to a *pro rata* distribution executions, judgments, mortgages and all sorts of liens and incumbrances. Even if it wears an air of generality we must look into, examine and endeavor to ascertain its intention and real meaning." Qui hæret in litera, hæret in cortice."

It is presumed, that the legislators knew the existing laws, and if they intended cutting off *prior* liens or rights, they *would have said so clearly* and *positively*, and not by a *side blow*, as remarked by the South Carolina Court, destroy all the law as to the binding force and effect of liens by executions, judgments, &c.

The statute uses the words "creditors," "*claims* and *demands.*" They were unquestionably used in a popular sense, and according to one of the rules of interpreting statutes must receive that construction, for it would be absurd in *that* sense to call a mortgage, judgment or execution a claim or demand.

I contend, that the statute of Charles 2d is not repealed or impaired by the act of 1853, even in cases of insolvency of estates. "A general statute *without negative words* will not repeal the particular provisions of a former one, unless the two are irreconcilably inconsistent." Sedgewick on Stat., 123. There must be an *intention* in the last and subsequent statute to control or alter former one, and *no repeal* if they can both stand together, and repeals by *implication* are not

favored.—Ib. pp. 124, 127, 128. Bishop Cr. Law, §92, §79.

The law of 1853 is of *affirmative* character ; it contains no *negative words*, no words of *repeal*. It is a familiar canon of interpretation, that if a law can bear two constructions, one reasonable and just, the other calculated to produce grievous wrong and injustice, the first is to be preferred. Again, there is another familiar principle, that statutes in derogation of the common law, or of a *previous enactment*, are to be construed *strictly*. Bishop on C. L., §91. When laws provide *extraordinary remedies*, they are to be *strictly* construed. Hardee vs. Langford, 6 Florida Reports, 12.

The intention of the law was no doubt to pay creditors *pro rata*, having a regard to, and preserving all *prior* rights, liens and incumbrances. Full force and effect are of course to be given to a statute, but one that *intends* to take away vested legal rights should be *clear, positive* and *plain*, and leave nothing to implication. Then a party knows what he is to expect and contracts accordingly, but after he has secured a legal right through legal forms and then to lose it, would be a denial and mockery of justice ; and again I say, if the rights of my clients, by virtue of their execution, are denied, so then will be those of a mortgagee, a judgment creditor, an attaching creditor, or a woman seeking dower, for *none of these are excepted by the statute of* 1853.

It is urged that the law of 1853 repeals the acts of 1828 and 1832, found in Thompson's Dig. 206, and consequently changes the entire order of the payment of debts. These laws apply to *solvent* and the statute of 1853 to *insolvent* estates solely. The law of 1828 declares that debts shall be paid as follows: 1st, Funeral expenses ; 2d, Debts for board and lodging during the last illness ; 3d, Physicians' and Surgeons' bills for medicine and attendance ; 4th, Judgments, &c. The law of 1832 simply declares, that debts for nursing and attendance, or for medicines by an apothecary, shall be placed on an equal footing with those of the third

class, to-wit: Physicians' bills for medicine and attendance, and in case of insolvency each shall be paid *pro rata.* This *pro rata* payment in cases of insolvency extends only to these several items and ends with *them.*

The law of 1853 is an isolated, independent statute, having no connexion with any other, simply repealing that portion of the act of 1832 in relation to cases of insolvency, and does not trench upon the law of 1828 at all. That statute, and all of 1832 remain in full force, except the last clause in relation to the payment of some small items in cases of insolvency; and I reiterate that the laws of 1828 and 1832 apply to *solvent* estates, (with the slight exception above alluded to,) and that of 1853 to *insolvent* estates solely and exclusively.

*W. D. Barnes* for Appellee.

This case rests entirely upon the statutes of this State regulating the settlement of insolvent estates.

The act of 20th November, 1828, (3d sec.) Thomp. Dig., page 206, in providing for the order of payment of the debts of insolvent estates, includes "judgments of record" among the preferred claims. But that section is repealed by the act of January 8th, 1853, the 4th section of which makes the following provision for the payment of the debts of such estates:

"* * * The expenses of administration of said estates shall be first paid, and the funeral expenses of the deceased shall be next paid, and *all other claims or demands* allowed against such estate shall be paid *pro rata.*"

The revision and alteration of the act of 1828 clearly shows an intention on the part of the Legislature to exclude judgment creditors from the number of preferred claimants; for why should they, with the law of 1828 before them, (wherein judgment creditors are preferred,) after excepting

16

two classes of creditors, (which are also excepted in the former law, be so particular to state, in the act of 1853, that " *all other claims*, &c., shall be paid *pro rata ?*"

When we consider these two acts together, the latter as clearly negatives the idea of preferring judgment over other creditors as if it had been so expressed in words.

The court will bear in mind, in this case, that no levy was made of the execution in question until after letters of administration had been granted to the appellee, and all the property belonging to the estate of the said Daniel was assets in his hands for a settlement of the same, and to be disposed of or distributed according to law.

DuPONT, C. J., delivered the opinion of the court.

The record before us shows that Messrs. Crane, Boylston & Co., in April, 1862, obtained a judgment at law against Williams Daniel, upon which judgment execution was issued and placed in the hands of the Sheriff in the lifetime of the defendant, but which remained unexecuted at the time of his decease. Afterwards letters of administration were granted to the appellee upon the estate of the said deceased. On the 23d of January, 1866, the said execution was levied upon twenty bales of cotton in the hands of the administrator Jenkins, who thereupon filed his bill for injunction, suggesting the insolvency of the estate, and obtained an order to enjoin the sale thereof, upon the ground that the said claim was to be settled *pro rata*, with the other demands against the estate. There was also an agreement between the parties that the cotton should be sold and the money paid into the registry of the court to abide the result of this appeal. From the order granting the injunction this appeal is taken, and is now submitted to this court for final adjudication.

The question arising in this case grows out of a seeming discrepancy in the phraseology of the act of 1828, and that

Kimball vs. Jenkins—Opinion of Court.

of the subsequent act of January 8th, 1853, prescribing the order in which the debts of estates are to be paid. In the act of 1828, (Thompson's Dig. 206, § 3,) it is provided that "executors and administrators shall pay the debts of the deceased in the following order: first, the necessary funeral expenses; next, debts due for board and lodging during the last sickness of the deceased; next, physicians' and surgeons' bills for medicines and attendance during the last sickness of the deceased; next, judgments of record rendered and docketed in this State, during the lifetime of the deceased, and all debts due to this State; and finally, all other debts whether by specialty or otherwise, without distinction of rank."

The subsequent act of 1853, (Pamph. Laws of 1852–'3, p. 106, sec. 4,) provides, "that upon the final settlement of estates, under the provisions of this act, the expenses of the administration of the estate shall be first paid, and the funeral expenses of the deceased shall be next paid, and all other claims or demands allowed against such estates shall be paid *pro rata.*"

In contrasting these two acts it will be seen that while the act of 1828 assigned to "judgments of record" a specified place in the order of payment, the mention of them is entirely *omitted* in the subsequent act of 1853, and it is hence inferred and insisted upon, by the counsel for the appellee, that this omission shows a clear intention of the Legislature to exclude this class of debts from the list of preferred claims, and to place them on a footing with simple contract debts. In enforcing this view of the case, the counsel very properly called the attention of the court to the familiar rule that in the construction of statutes the old law and the mischief to be remedied was to be considered. The court recognizes the correctness and value of the principle invoked, but does not perceive either the necessity of its application in the interpretation of the statute now under consideration, or the

benefit to accrue to the appellee by its adoption as a rule of construction.    In the opinion of the court, if there was any mischief contained in the act of 1828, which it was designed to remedy by the enactment of the statute of 1853, it was, that the rule of the common law which gave to "judgments of record" a *priority* over simple contract debts had been altered by that act, and they subordinated and postponed to " debts due for boarding and lodging during the last sickness of the deceased, and physicians' and surgeons' bills for medicines and attendance during the last sickness of the deceased."    The act of 1853 in *omitting* to mention this class of demands, "judgments of record," in the order of payment, did nothing more than to relieve them from the subordination imposed by the act of 1828, and thus restore them to the rank and dignity assigned by the rule of the common law.    For it is a well established principle that a common law right cannot be taken away by mere implication.    We do not question the authority of the Legislature to place "judgments of record" upon a footing with, and even to postpone them to the payment of simple contract debts, but then to do so, they must couch their enactments in appropriate language.    In the act of 1828 the Legislature exercised this authority, and no question can be made as to their intentions.

But should we be in error as to the effect to be given to the act of 1853, there is one view of the case which is decisive of the right of the plaintiff in execution to maintain his priority of payment.    By the statute law of the land, from the organization of the territorial government to the present time, "judgments" were given a *lien* on the land of the defendant from their rendition.    (Vide Thomp. Dig. 352, note *a*.)    It was also declared by the act of 1829, (vide Thomp. Dig. 21, § 2,) that " the common and statute laws of England, which are of a general and not of a local nature, with the exception hereinafter mentioned, down to the 4th day of

Kimball vs. Jenkins—Opinion of Court.

July, 1776, be and the same are hereby declared to be of force in this State, &c." Amongst the British statutes thus adopted and made a part of our law is that of 29th Car. II. C. 3, § 16, which limits the common law lien on the defendant's *goods*, by virtue of the *fieri facias*, to the time such writ shall be delivered to the Sheriff. By reference to the facts of the case, it will be seen that the judgment was obtained and the *fieri facias* issued and placed in the hands of the Sheriff during the lifetime of the intestate, and thus a *lien* upon both his land and goods had attached, and remained in full vigor at the time of his death. It is true that this is but a statutory lien, or one given by mere operation of law, but in the absence of any positive statute of our own limiting its force and effect, we know of no good reason why it should not be esteemed of as high dignity and as sacred in its character as a conventional lien, or one given by the contract of the parties. We are fully sustained in this view of the case by the highest authority. In the case of Rankin et al., vs. Scott, (12 Wheat. 177, 6 Con. Rep. 504,) C. J. Marshall says, " a statutory lien is as binding as a mortgage and has the same capacity to hold lands, so long as the statute preserves it in force." In the case of Andrews vs. Doe ex dem. Wilkes, 6 Howard's Mississippi Rep'ts 554, Chief Justice Sharkey says, " there can be no difference in principle between a mortgage and a statutory lien. The one is as binding as the other." This doctrine is fully recognized and sanctioned by this court in the case of Mosely vs. Edwards, reported in 2 Fla. Repts. 439. It will thus be seen that at the date of the death of the intestate, the plaintiffs in execution, by virtue of their judgment and execution, held a *lien* on all the estate of the decedent, as binding as though that estate had been mortgaged to him, *so long as the law or statute creating that lien should continue in force.* The question then arises, is there anything in the act of 1853 which would indicate a design on the part of the Legislature

to vacate, impair or modify that lien?   It is insisted by the counsel for the appellee that the words of the statute, " *all other claims and demands*," have that effect, and are sufficiently comprehensive to embrace the claim now contended for.   But if this be so, will not the words equally embrace a claim secured by mortgage, and yet no one would pretend to advance such a doctrine.   As long as the law which created the lien is continued in force, in the words of Chief Justice Marshall before cited, " a statutory lien is as binding a as mortgage."   It is not pretended that there is in the statute of 1853 any positive words vacating or impairing this lien, but the conclusion is arrived at by a mere implication of too vague and uncertain a character to warrant us in depriving the party of a right secured to him by the common law and confirmed by a statute of ancient date.

If the Legislature designed to divest this class of claims of their long established lien upon the estate of the decedent, they have certainly failed of their purpose in the enactment now under consideration.   To do so, they ought to have used more positive terms, and not left their intention to be gathered from a mere omission, or at best, a doubtful interpretation.   Liens, whether by contract of the parties or by operation of law, are of too sacred a character to be divested or even impaired by vague and uncertain implication.   Both policy and morality require that they should be sustained, whenever it may be done without a violation of positive law.

The case of Dye, Adm'r, vs. Bartlett, (7 Howard's Miss. Repts., 224,) was cited by the counsel for the appellant, but not having had access to the volume, we are unable to determine how far it sustains his case.   In the reference, however, which we find in 8 Howard's S. C. Repts., 111, in the case of Williams vs. Benedict, it would seem to be exactly in point, and we regret that we have not been able to examine it.

Kimball vs. Jenkins—Opinion of Court.

It may not be out of place to refer, by way of analogy, to the laws of the United States giving *priority* to the government in cases of insolvency. So far as we have had access to these laws, we find no *saving clause* as to "prior liens," and yet in the adjudicated cases they are universally recognized and preserved.—Vide 2 Wheaton R., 396; 3 Cranch R., 373; 1 Peters R., 386.

The question arising out of this record being one that must frequently occur in the administration of estates, we have endeavored to give it a patient and careful investigation, and are inclined to the opinion that, in the enactment of 1853, it was not so much the design of the Legislature to interfere with the order prescribed in the act of 1828, for the payment of debts, as to provide a more ready and convenient mode for the settlement of insolvent estates. As, however, the adjudication of this point is not necessary to the decision of the case before us, we would not be understood as being committed to the opinion above expressed.

In accordance with the conclusion arrived at in the foregoing opinion, it is ordered, adjudged and decreed, that the decree of the Chancellor be *reversed*, and that the injunction heretofore granted in this case be annulled and set aside and the bill be dismissed; and this court, in proceeding to render such order and decree as should have been rendered in the court below, doth order adjudge and decree that the twenty bales of cotton mentioned in complainant's bill of complaint be sold in accordance with the terms entered into between the parties, and which is made a part of the record in this suit, and that the proceeds thereof be applied first to the payment of the appellant's fi. fa., with all costs accruing thereon, and the surplus if any to be paid over to the appellee as administrator on the estate of Williams Daniel, deceased, to be appropriated in due course of administration.

Kimball vs. Jenkins—Opinion of Court.

It is further ordered that the costs of this appeal be paid by the appellee and to be allowed him in his settlement of the estate.